**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**RODNEY GRAY**                                                                 **PETITIONER**

**VS.**                                                          **CIVIL ACTION NO. 4:04CV234LG**

**CHRISTOPHER EPPS, Commissioner, MDOC
LAWRENCE KELLY, Superintendent, Mississippi
State Penitentiary and JIM HOOD, Attorney
General of the State of MS**                                        **RESPONDENTS**

_____

**MEMORANDUM OPINION AND ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

Rodney Gray was convicted in the Circuit Court of Newton County, Mississippi, of

capital murder, with underlying offenses of kidnaping and rape. He was sentenced to death on

January 25, 1996. Gray's conviction and sentence were affirmed by Mississippi Supreme Court.

*See Gray v. State*, 728 So. 2d 36 (Miss. 1998). Gray's petition for state post-conviction relief

was denied. *See Gray v. State*, 887 So. 2d 158 (Miss. 2004). On April 8, 2005, Gray filed a

Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Having reviewed the

extensive record, briefs, arguments of counsel, and the relevant legal authority, it is the opinion

of this Court that the Petition should be denied.

**FACTS**

Grace Blackwell was a seventy-nine year old resident of the Montrose area in Jasper

County, Mississippi. During the morning hours of August 15, 1994, Blackwell drove her car to

Peoples Bank of Louin, Mississippi. One of the bank tellers, Arlene McCree observed

Blackwell's car as it turned into the bank parking lot and proceeded to the drive-through window.

McCree had known Blackwell for many years and customarily waited on her. According to

McCree, Blackwell usually came to the bank with a prepared personal check made out to cash and never for more than one hundred dollars. On this occasion, Blackwell immediately told McCree that she needed twelve hundred dollars. McCree described Blackwell as unusually agitated and testified that she "looked terrible." McCree's view was obscured, and she was not able to discern if someone else was in the car. When Blackwell did not produce a check for the withdrawal, McCree asked her if she had one. In response, Blackwell threw a blank check into the window tray. McCree filled out the check and gave it to Blackwell for her signature. When McCree placed the cash in the tray, Blackwell grabbed it and hurriedly drove away from the window. McCree now convinced that something was terribly wrong called the Jasper County Sheriff's Department to report that she believed Blackwell had been kidnaped. In response, the Sheriff's Department sent an officer to Blackwell's home. Deputy John Riley arrived about 12:30 p.m. He found that the door was open, and the telephone wires had been disconnected. Blackwell's car was missing. Deputy Riley also discovered footprints in Blackwell's yard.

Blackwell's body was found near Decatur, Mississippi, at approximately 1:40 p.m. Lisa Creel of the Decatur Police Department was the first responding officer. Officer Creel observed massive damage to the victim's face and head apparently caused by gun shots. Creel noticed a separate laceration to the head and black speckling on the victim's arm. The victim had a large laceration on the back of her leg. Officer Creel also observed a blood trail which angled across the road from the east. Additional physical evidence was taken from the crime scene including broken glass, shotgun wadding, some of Blackwell's personal belongings, and her purse. There was no cash in Blackwell's purse or in her billfold.

An autopsy was performed, at which time it was determined that Blackwell had suffered two shotgun blasts.  The fatal shot was a contact wound, caused when the muzzle of a shotgun was placed against her mouth and fired.  Because the shot did not transect any major vessel, the examiner opined that it could have taken as long as ten minutes for Blackwell to die from the injury.  The other shotgun wound was non-fatal.  It appeared to have been fired through an intermediate target, and it struck the left side of her face and body.  In addition to the gunshot wounds, there were scrapes and bruises consistent with sliding on a hard surface, and a six inch laceration over the right calf.  There was little bleeding from the calf injury, indicating that it occurred after death.  The examiner also observed an abrasion about an inch long on Blackwell's labia majora.  The abrasion was determined to be consistent with trauma or force.

Blackwell's car was discovered near a dumpster at a Decatur service station parking lot.  A significant amount of blood was observed inside the vehicle on the passengers side.  The front of the car had been damaged.  Blood and tissue were discovered on the front, across the hood, on the windshield, and down the passenger side of the car.  The driver's side front window had been blown out.

Rodney Gray was arrested that same afternoon.  Prior to his arrest, officers seized $1,123.00 in cash that Gray had reportedly hidden in a bathroom vent at his girlfriend's home.  Officers also seized a pair of boots and a shirt reportedly worn by Gray on that day.  Hair and blood samples were obtained from Gray while in custody.  All of the physical evidence was submitted to the F.B.I. for analysis.  It was ultimately determined that a pubic hair taken from the victim's undergarments matched the defendant.  Likewise, DNA testing of semen discovered in the victim's undergarments matched the defendant.  Glass shards taken from the crime scene

3

matched glass fragments found in the defendant's shirt.  A plaster cast of a footprint found in the victim's yard also matched the defendant's boots.

Gray was tried in the Circuit Court of Newton County, Mississippi, in January, 1996.  In addition to the physical evidence, the prosecution produced a witness who saw Gray and a white female in Blackwell's car on the morning of the murder.  The prosecution also introduced testimony regarding inculpatory statements made in the presence of other inmates while Gray was in custody.  After hearing all of the testimony of lay and expert witnesses, and reviewing the evidence, the jury returned a guilty verdict on the charge of capital murder.  The sentencing phase followed, after which the jury sentenced Gray to death.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which modified 28 U.S.C. § 2254, provides in part that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where the state court adjudicates the petitioner's claim on the merits, this Court reviews questions of fact under § 2254(d)(2), while questions of law or mixed questions of law and fact

are reviewed under § 2254(d)(1).  Factual findings are presumed to be correct, and the Court

must defer to the state court's decision regarding factual determinations unless it "was based on

an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  The

Court independently reviews questions of law and mixed questions of  law and fact to determine

whether the state court's decision was either "contrary to" or an "unreasonable application of"

federal law.  *Williams v. Taylor*, 529 U.S. 362 (2000); *see also Williams v. Puckett*, 283 F.3d 272

(5th Cir. 2002); *Hill*, 210 F.3d at 485.

For purposes of this analysis, "federal law" is determined by the United States Supreme

Court, and this Court relies on United States Supreme Court precedent to determine whether the

state court's decision was "contrary to" or "an unreasonable application of" established federal

law.  28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 378, 406.  A state court's adjudication of a

claim is *contrary to* clearly established federal law "if the state court applies a rule different from

the governing law set forth in [the Supreme Court's] cases or if it decides a case differently than

[the Supreme Court] on a set of materially indistinguishable facts."  *Bell v. Cone*, 535 U.S. 685,

694 (2002); *Perez v. Cain*, 529 F.3d 588, 593-94 (5th Cir. 2008).  A state court's application of

the correct legal precedent to the particular facts of a petitioner's case will be an *unreasonable*

*application* of the law if it identifies the correct federal law but unreasonably applies it to the

facts, unreasonably extends the correct legal principle to a new context where it should not apply,

or unreasonably refuses to extend the principle to a new context where it should apply.

*Williams*, 529 U.S. at 406.  The Supreme Court has distinguished the term "unreasonable" from

"erroneous" or "incorrect;" thus, a state court's incorrect application of the law may stand if it is, nonetheless, "objectively reasonable." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).

## DISCUSSION OF THE ISSUES

### A. THE DEFECT IN THE INDICTMENT AND VERDICT FORM

Grays raises two due process claims regarding the indictment and the form of the verdict. First, he contends that his right to due process was violated because the indictment did not enumerate the aggravating circumstances on which the State would rely in seeking the death penalty. Second, he argues that the verdict form does not indicate that the jury found evidence of the underlying offenses, which also served as the aggravating factors, beyond a reasonable doubt. Respondents counter that Gray's arguments lack merit and that both claims are procedurally barred.

### The Indictment

The indictment charged that Gray "did willfully, unlawfully, feloniously and of his malice aforethought kill and murder Grace Blackwell, a human being, while engaged in the commission of the crime of kidnapping [sic] and/or rape, contrary to and in violation of Section 97-3-19(2)(e), Miss. Code Ann. (1972), as amended." At the close of the guilt phase, the jury was instructed that capital murder "is the killing of another person while engaged in another crime. In this case, either kidnaping or rape. It doesn't have to be both kidnaping or rape, but killing in the course of a kidnaping or a rape, one or the other."

Gray did not raise this particular claim on direct appeal. However, he did argue that the indictment was defective because the underlying offenses were described in the disjunctive. The Mississippi Supreme Court held that the issue was procedurally barred. The court reasoned that,

although Gray had moved to quash the indictment on other grounds, he did not attack the indictment language. *Gray*, 728 So. 2d at 36. Later, in his state post-conviction petition, Gray raised the issue of the omitted aggravating factors in the indictment. Relying on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), Gray argued that inclusion of the aggravating factors was essential to a capital murder indictment. The Mississippi Supreme Court disagreed, holding that the scope of *Apprendi* and *Ring* was restricted and did not control the issue of whether aggravating circumstances must be included in the indictment. *Gray*, 887 So. 2d at 174. Moreover, the court held, the indictment was proper under state law:

> We believe that the fact that our capital murder statute lists and defines to some degree the possible aggravating circumstances surely refutes the appellant's contention that he had inadequate notice. Anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment.

*Id.* (quoting *Williams v. State*, 445 So. 2d 798, 804-05 (Miss. 1984)).

Respondents point out that Gray's direct appeal was concluded prior to the United States Supreme Court decisions in *Apprendi* and *Ring* and that their holding cannot be applied retroactively. A conviction becomes final for retroactivity analysis when the direct appeal to the state court is concluded and the time for petitioning for certiorari has expired or a timely petition for certiorari has been denied. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). After direct appeal, Gray filed a petition for writ of certiorari to the United States Supreme Court. The petition was denied on April 5, 1999. *Apprendi* was decided in 2000, and *Ring* was decided in 2004, so neither would apply to his case.

In considering Gray's challenge on the merits, the Mississippi Supreme Court found that both *Apprendi* and *Ring* "held unconstitutional sentencing procedures where a judge rather than a jury determined whether there were aggravating circumstances sufficient to warrant imposition of the death penalty." *Gray*, 887 So. 2d at 173. The court also found that *Ring* did not apply, because the petitioner in *Ring* was contesting the propriety of a judge's making aggravating factor findings, not the sufficiency of the indictment. Gray has not shown that the Mississippi Supreme Court's decision regarding the sufficiency of the indictment is contrary to or an unreasonable application of clearly established federal law. *See also Simpson v. Quarterman*, No. 1:04-CV-485, 2007 WL 1008193 at *21 (E.D. Tex. Mar. 29, 2007) ("Neither *Apprendi* nor *Ring* held that aggravating factors in a state capital case must be pleaded in the indictment.")

**The Verdict Form**

At the conclusion of the sentencing phase, the jury was given instruction S-6 without objection.[1] The instruction charged that the jury could consider two aggravating factors in determining whether to impose the death penalty and included a form of the verdict. The jury was instructed to consider whether the capital offense was committed while the defendant was engaged in the commission of the crime of kidnaping and whether the capital offense was committed while the defendant was engaged in the commission of, or an attempt to commit, the crime of rape. The form of the verdict also instructed the jury to list the aggravating factors

---

[1] The prosecution requested an instruction that included two additional aggravating factors– whether the capital offense was committed for pecuniary gain and whether the murder was especially heinous, atrocious or cruel. The requested instruction was refused by the trial judge.

which they unanimously found beyond a reasonable doubt.[2]  The jury unanimously found that

Gray murdered Blackwell while engaged in the commission of kidnaping and while engaged in

the commission of or an attempt to commit the crime of rape.[3]

Gray contends that the jury verdict does not indicate that the jury unanimously found the

aggravating circumstances "beyond a reasonable doubt."  The issue was raised for the first time

in Gray's petition for state post-conviction relief.  There, the Mississippi Supreme Court held that

the issue was procedurally barred because it had not been raised on direct appeal.  *Gray*, 887 So.

2d at 172.  Alternatively, the court held that the issue lacked substantive merit.  The court

reasoned that the jury was presumed to have followed the trial court's instruction, which required

---

[2]The court's instruction S-6 included the following form:

> We, the jury, unanimously find that the aggravating circumstance(s) of : [List or itemize all the aggravating circumstance(s) presented in section B of this instruction which you unanimously agree exist in this case beyond a reasonable doubt.]
>
> . . . .
>
> is/are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstance(s), and we further find unanimously that the Defendant should suffer death.

[3]The jury returned the following verdict:

> We, the Jury, unanimously find that the aggravating circumstances of: 1. The capital offense was committed while the Defendant was engaged in the commission of kidnaping; 2. The capital offense was committed while the Defendant was engaged in the commission of or an attempt to commit the crime of rape; are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we further find unanimously that the Defendant should suffer death.

9

the jury to unanimously find the existence of aggravating factors beyond a reasonable doubt.  *Id*. (citing *Payne v. State*, 462 So. 2d 902, 904 (Miss. 1984)).

Applicants seeking federal habeas corpus relief under § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief.  *See Edwards v. Carpenter*, 529 U.S. 446 (2000); *Coleman v. Thompson*, 501 U.S. 722, 729-55 (1991); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).  The exhaustion requirement is satisfied when the substance of the federal habeas corpus claim has been fairly presented to the highest state court in a manner that adequately developed the factual basis for the claim.  *Williams v. Taylor*, 529 U.S. 420 (2000).  In contrast, where a petitioner has defaulted his federal claim in state court pursuant to an adequate and independent state procedural rule, the claim cannot be reviewed.  *Coleman*, 501 U.S. at 729.  The state procedural rule must, however, be "strictly or regularly followed."  *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988).  A petitioner claiming that a state procedural ground is not regularly followed bears the burden of establishing that claim.  *Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000).  The Mississippi Supreme Court opinion, as well as the briefs submitted in support of appeal, indicate that Gray did not raise this precise issue on direct appeal.  Instead, he argued that the evidence submitted during the sentencing hearing was insufficient for the jury to find, beyond a reasonable doubt, that he kidnaped Blackwell or intended to kill her.  *Gray*, 728 So. 2d at 73-74.

Gray can only satisfy the exhaustion requirement by showing that the substance of his federal habeas corpus claim has been fairly presented to the highest state court in a manner that adequately developed the factual basis for the claim.  *Williams*, 529 U.S. at 429-30.  The presentation must also alert the state court as to the legal basis for the claim.  *Baldwin v.*

10

*Reese*, 541 U.S. 27, 29 (2004).  Having raised a materially different claim on appeal, Gray cannot argue that he exhausted his form of the verdict claim in state court.  Gray also argues that the Mississippi Supreme Court's review of the issue on the merits constitutes a waiver of the procedural bar.  This argument is unpersuasive.  A state court may make an alternative merits ruling without waiving the holding that the issue is procedurally barred.  *Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005).

Alternatively, Gray has failed to established that the Mississippi Supreme Court's post-conviction disposition of this issue on the merits was contrary to or an unreasonable application of clearly established federal law.  While the jury did not recite the phrase "beyond a reasonable doubt" in their verdict form, they were clearly instructed to list all of the aggravating circumstances "which you unanimously agree exist in this case *beyond a reasonable doubt*." (emphasis added).  It is well established that juries are presumed to follow the court's instructions.  *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993); *Moore v. Quarterman*, 534 F.3d 454, 467 n.20 (5th Cir. 2008).  That presumption can only be overcome by showing "an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating."  *United States v. Patino-Prado*, 533 F.3d 304, 313 (5th Cir. 2008) (quoting *United States v. Barksdale-Contreras*, 972 F.2d 111, 116 (5th Cir. 1992).  Absent such a showing, the claim is without merit.

## B.  THE TRIAL COURT'S REFUSAL TO STRIKE THE DNA EXPERT TESTIMONY

In this assignment of error, Gray argues that he was denied his constitutional right to confront and cross-examine each individual FBI employee who actually participated in the DNA testing process.  Melissa Smrz was the only DNA expert who testified at trial.  In Smrz's expert

opinion, the probability that the semen found in the victim's panties did not come from Gray was less than 1 in 446,000,000 persons in the Black, Caucasian, and Hispanic populations.  Smrz underwent extensive cross-examination about the extent of the lab work that she actually performed.  Smrz explained that a major part of the DNA testing process is completed by technicians.  Smrz admitted that she did not conduct the extractions or participate in "bench work."  However, she did conduct an evaluation of the autorads and performed the sizing procedure.  Smrz testified that she reviewed all of the evidentiary items received even though she may not have been physically present during processing.  Smrz described the testing and evaluation process as similar to "a doctor in a hospital who has a lot of individuals who work on patient information or patient data, like a laboratory technician, or a nurse, or X-ray technician, and then that doctor is responsible for putting all that information together and evaluating and making diagnoses."  Smrz also testified that had a mistake occurred in the initial process, an error would have been obvious in the test results.  At the conclusion of Smrz's testimony, defense counsel moved that it be excluded because Smrz had not performed the DNA tests.  The trial judge denied the motion, relying on Smrz's explanation of the laboratory control procedures and verification process.

Gray raised Smrz's expert testimony as an assignment of error on direct appeal.  The Mississippi Supreme Court found no grounds for reversal.  The court held that the evidence was

admissible under MISS. R. EVID. 703.[4]  *Gray*, 728 So. 2d at 56.  The Commentary to Rule 703

recognizes the traditional sources of information from which an expert may base his opinion; (1)

personal observation and (2) hypothetical questions.  The Rule newly recognizes a third source:

data that is given to the expert outside the courtroom and not obtained by his personal

observation.  In explaining this additional source, the Commentary specifically notes, as an

example, physician testimony:

> Most of his sources are admissible in evidence but only with the expenditure of
> substantial time in producing and examining various authenticating witnesses.
> Since these sources provide the doctor with information that he utilizes in making
> life-and-death decisions, his validation of them ought to be sufficient for trial,
> especially since he can be cross-examined.

MISS. R. EVID. 703.

The Mississippi Supreme Court concluded that Smrz's testimony was admissible under

Rule 703, in that it was based on "DNA extracted by technicians under her control."  *Gray*, 728

So. 2d at 57.  Thus, her testimony used the third example of permissible data on which to base

her opinion.  Additionally, the court analyzed Gray's claim under the Confrontation Clause of the

Sixth Amendment and found no violation.  In making that determination, the court noted that

"Gray was able to confront and cross-examine the expert who evaluated the autoradiographs and

did the sizing procedure, Ms. Smrz."  *Id*.  Gray raised this claim again in his petition for post-

conviction relief, but it was denied on grounds of res judicata.  *Gray*, 887 So. 2d at 171.

---

[4]Rule 703 states in part:

> The facts or data in the particular case upon which an expert bases an opinion
> or inference may be those perceived by or made known to him at or before
> the hearing.  If of a type reasonably relied upon by experts in the particular
> field in forming opinions or inferences upon the subject, the facts or data
> need not be admissible in evidence.

Gray's claim in this Court is based upon his contention that permitting Smrz to testify regarding tests that she did not perform violated his right to confront and cross-examine witnesses, in violation of the Sixth and Fourteenth Amendments.  He further argues that Smrz's testimony "was the only tangible proof that Gray was in physical contact with, and raped, Mrs. Blackwell."  Thus, he reasons, the introduction of Smrz's testimony rendered his trial fundamentally unfair.  Additionally, Gray argues that the testimony was not admissible under Rule 703 because it lacked reliability, being based on the results of tests conducted by non-testifying witnesses.  Finally, because the tests were prepared in anticipation of litigation, Gray asserts that they were not the type reasonably relied on by experts, nor could they be appropriately categorized as business records.

Gray relies on *Crawford v. Washington*, 541 U.S. 36 (2004).  In *Crawford*, the Supreme Court held that the Confrontation Clause of the Sixth Amendment prohibits admission of testimonial statements made out of court, except under certain limited circumstances.  *Crawford* involved the admission of a tape recorded statement given by the defendant's wife to police.  The court held that the statement was improperly admitted, as it was a testimonial statement that should have been subject to cross-examination.  *Id*. at 68 (overruling *Ohio v. Roberts*, 448 U.S. 56 (1980))  The admission of the statement violated Crawford's Sixth Amendment right to confront and cross-examine witnesses against him.  541 U.S. at 68.  Rejecting *Roberts's* prior holding that the test for admission of hearsay evidence in a criminal prosecution was based on the **reliability** of the evidence, the Court held that the test was really based on the **nature** of the evidence.  *Id*.  Thus, where hearsay evidence is testimonial in nature, "the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually

14

prescribes: confrontation." *Id*. at 69.  The Court declined to define the term "testimonial," holding that, at a minimum, the term encompassed prior testimony and police interrogations.

*Crawford* was decided in 2004.  It cannot be applied retroactively to cases that were final on direct review prior to the decision.  *Whorton v. Bockting*, 127 S. Ct. 1173, 1184 (2007). Gray's direct review was concluded on April 5, 1999.  Thus, Gray cannot invoke the holding in *Crawford* to attack the admission of Smrz's trial testimony.

In any event, Gray's reliance on *Crawford* is unavailing.  Courts have addressed the question of whether laboratory reports, raw data and materials used to formulate expert opinions are "testimonial" and therefore subject to cross-examination at trial.  In *United States v. Henry*, 472 F.3d 910, 914 (D.C. Cir. 2007), the court held that *Crawford* did not involve expert witness testimony and, thus, did not prevent an expert witness from relying on hearsay testimony under FED. R. EVID. 703.  In *United States v. Washington*, 498 F.3d 225, 229-30 (4th Cir. 2007), the court held that a defendant was not entitled to confront lab technicians who operated the machines that analyzed his blood.  Because the machines only generated raw data, there were no "statements" and no "declarants" who could be cross-examined.  *Id*. at 231.  The court in *United States v. Moon*, 512 F.3d 359, 361 (7th Cir. 2008), approved the admission of trial testimony from a laboratory chemist who had not actually performed some of the tests and had relied on analyses performed by other technicians.  The court noted that the report that had been prepared by the technician who actually performed the tests had both a testimonial and a non-testimonial component: the testimonial component was the employee's conclusion, while the non-testimonial component was the raw data on which the employee's opinion relied.  *Id*. at 362.  Because the chemist who actually testified at trial relied only on the raw data to reach his conclusions, the

court held that his testimony was no different from that of a doctor who relies on hospital tests he has not performed himself.  *Id.*  In *United States v. Richardson*, 537 F.3d 951 (8th Cir. 2008), the prosecution called Alyssa Bance, a forensic scientist, to testify about DNA evidence linking the defendant to the charged offense.  Bance did not perform or witness any DNA testing of samples in the case.  Instead, she testified as to the tests, procedures and controls used by other chemists. Bance admitted that her own knowledge of the tests was from reviewing the work generated by other chemists, conducting a second independent analysis of that data, and comparing her analysis of the data with the analysis of the same data by other chemists.  Counsel for the defendant raised hearsay objections throughout the testimony which were overruled.  The court held that the expert testimony was admissible and did not violate the Confrontation Clause:

> Richardson argues that the tests and conclusions performed by Kuriger are testimonial; therefore Bance could not testify as to these without violating the Confrontation Clause. Bance, however, testified as to her own conclusions and was subject to cross-examination.  Although she did not actually perform the tests, she had an independent responsibility to do the peer review.  Her testimony concerned her independent conclusions derived from another scientist's tests results and did not violate the Confrontation Clause.

*Id.* at 960.

Smrz relied on the autoradiographs that were machine-generated from the DNA samples that were analyzed.  She had an independent duty to review the testing procedures and the results. The Mississippi Supreme Court relied on Miss. R. Evid. 703 to hold that, as an expert witness, she was entitled to rely on data generated by others.  The Mississippi Supreme Court's holding is neither contrary to nor an unreasonable application of clearly established federal law.

The applicable precedent at the time that Gray's appeal was decided was *Roberts*, 448 U.S. 56.  Under *Roberts*, a hearsay statement could be admitted "if the statement bore sufficient

indicia of reliability, either because the statement fell within a firmly rooted hearsay exception or because there were 'particularized guarantees of trustworthiness' relating to the statement in question." *Whorton*, 127 S. Ct. at 1178 (quoting *Roberts*, 448 U.S. at 66). Gray argues, alternatively, that Smrz's testimony could not be admitted under *Roberts*, as it was neither trustworthy nor firmly rooted in a hearsay exception. Gray defends this argument by citation to two federal prosecutions – *United States v. Buonsignore*, 131 Fed. Appx. 252, 256-57 (11th Cir. 2005), and *United States v. Brown*, 299 F.3d 1252, 1258 (11th Cir. 2002). Those cases are inapposite, as the appellate court that reviews a federal prosecution exercises its supervisory powers rather than determines constitutional issues. *See Lowenfield v. Phelps*, 484 U.S. 231, 240 n.3 (1988) (noting that the holdings in such decisions need not be followed on habeas corpus review). Furthermore, *Buonsignore* was decided after *Crawford* and relied upon it. *Brown* involved the introduction, pursuant to FED. R. EVID. 703, of testimony regarding the street value of illicit drugs found in the defendant's possession. The testimony, given by a DEA agent with considerable experience investigating narcotics smuggling, relied on information provided to him by another agent, who had information on drug smuggling in the country to which the defendant apparently intended to transport the drugs. The court held that the testimony was properly admissible under Rule 703, and even under case law preceding that Rule, as an exception to hearsay for expert valuation testimony. *Brown*, 299 F.3d at 1258. The court went on to analyze the issue under the Confrontation Clause, recognizing the "special concerns" regarding the use of hearsay testimony in criminal prosecutions. The analysis was performed under *Roberts* for this pre-*Crawford* case, and the court considered whether the testimony fell into a "firmly rooted hearsay exception" or carried a "particularized guarantee of trustworthiness." *Id*. (quoting

*Roberts*, 448 U.S. at 66).  Concluding that both Rule 703 and long-standing precedent constituted

a "firmly rooted hearsay exception" that permitted introduction of this evidence, the court held

that defense counsel had effectively questioned the reliability of the data through his cross-

examination, so no constitutional error was committed.

In *Sherman v. Scott*, 62 F.3d 136, 139 (5th Cir. 1995), the court held that a habeas corpus

petitioner's right to confront witnesses was not violated by the introduction of a drug analysis

report that was prepared by two chemists who did not testify.  The court's point of reference was

*Roberts*, and its requirement of a firmly rooted hearsay objection or particularized guarantees of

trustworthiness.  *Id*. at 140.

> The supervisor testified about his own qualifications and experience as well as the
> qualifications and experience of the two chemists who performed the tests.
> Additionally, the supervisor recounted the standard analytical procedures used to
> determine the composition of unknown substances.  Finally, the supervisor
> testified that the report indicated that the chemists reached their results after
> performing these tests and following standard testing procedures.

*Id*. at 142.  Based on this evidence, the court concluded that there was "little question that these

routine procedures, performed and recorded also under standard laboratory procedures, were

trustworthy."  *Id*.  The court noted that it could not determine that the petitioner would have

gained any benefit from cross-examination of the chemists who prepared the report.  *Id*. (citing

*United States v. McCormick*, 54 F.3d 214, 224  (5th Cir. 1995); *Minner v. Kirby*, 30 F.3d 1311,

1315 (10th Cir. 1994); *Reardon v. Mason*, 806 F.2d 39, 42 (2d Cir. 1986); *United States v. Bell*,

785 F.2d 640, 643 (8th Cir. 1986)).

The Mississippi Supreme Court held that Smrz's testimony was admissible under Rule

703, as an expert opinion based partly on information she had learned outside court and not from

her personal observation.  The court further held that, because Gray was able to cross-examine

Smrz, his confrontation right was not violated.  A state court's decision cannot be the basis of

habeas corpus relief under the language of the AEDPA unless its reasoning or its result

contradicted federal law that has been clearly established by the United States Supreme Court.

*Early v. Packer*, 537 U.S. 3, 8 (2003).  Thus, the result may be upheld even if the controlling

cases are not cited, or even if the state court is unaware of those cases.  *Id*.  The controlling

precedent was *Roberts*, and the state court holding did not misapply or contradict it.

## C.  Improper Closing Argument by Prosecution at the Guilt Phase of Trial

During closing argument the prosecutor said the following:

> We presented so much evidence against this Defendant that the only reasonable verdict in
> this case is guilty of capital murder, and I know that, and you know that, Mr. Duncan [the
> other prosecutor] knows that, and everybody sitting in this room for the last three days
> knows that.

Defense counsel immediately objected to the prosecutor's remark.  The trial court, noting the

great latitude traditionally given attorneys during closing argument, overruled the objection.  The

Mississippi Supreme Court considered the issue on direct appeal and concluded that the

comments came "perilously close to the type of statements this Court has warned prosecutors to

avoid using in the presentation of their cases."  *Gray*, 728 So. 2d at 53.  In light of that warning,

which had been given in cases decided subsequent to Gray's trial, the state court could not say

the statements were not in error.  However, in light of the overwhelming evidence against Gray,

the Mississippi Supreme Court refused to reverse on this issue.  *Id*. at 54.

Gray argues to this Court that he is entitled to habeas corpus relief because "the State

failed to consider applicable federal law in reaching its decision, in violation of 28 U.S.C. §

2254."  In the context of federal habeas corpus review, however, the applicable federal law consists of the holdings of the United States Supreme Court as of the date of the state court's decision.  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citing *Williams* , 529 U.S. at 412. Gray has not directed this Court to any United States Supreme Court case that was disregarded by the Mississippi Supreme Court, other than a passing reference to *Caldwell v. Mississippi*, 472 U.S. 320 (1985), as the basis for the district court's decision in *Buttram v. Black*, 721 F. Supp. 1268, 1316-17 (N.D. Ga. 1989).

The applicable precedent is *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly*, 416 U.S. at 642).  The Mississippi Supreme Court conducted just such a review, holding that, although the comment may have been error, the weight of the evidence against Gray precluded a finding that the comment unjustly influenced the jury's verdict.  *Gray*, 728 So. 2d at 53-54.  Gray has failed to articulate exactly how the Mississippi Supreme Court decision violated United States Supreme Court precedent.  *Caldwell*, cited briefly in Gray's rebuttal memorandum, does not command a different result.  In *Caldwell*, the Supreme Court considered a prosecutor's closing argument in the penalty phase of a capital murder trial, in which he told the jury that any sentence it imposed was "not the final decision" and was "automatically reviewable" by the state supreme court.  472 U.S. at 324.  Although the Supreme Court reversed the case, insofar as the death penalty had been imposed, it did so only after a lengthy review of the prejudice caused by the remarks, which included a discussion of the distinction between Caldwell's case and the argument in *Donnelly*.  In *Donnelly*, the Court

20

concluded, the prosecutor's remarks did not prejudice a specific constitutional right so as to amount to a denial of it. *Id.* at 340. A different situation was presented in the *Caldwell* case, where the prosecutor's argument "sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Id*. (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)).

The Supreme Court decisions in *Donnelly* and *Darden* control. These cases instruct that a prosecutor's statements must be viewed in the context of the entire trial, including the evidence against the defendant. Here, the evidence against Gray was strong and included eyewitness testimony, forensic evidence, inculpatory statements in the presence of third parties and physical evidence recovered from Gray's residence. In light of the evidence, the prosecutor's comment cannot be said to have so infected the trial with unfairness as to have offended Gray's right to due process. The Mississippi Supreme Court's denial of relief on this point is neither an unreasonable application of, nor contrary to, clearly established federal precedent.

**D.  IMPROPER CLOSING ARGUMENTS BY THE PROSECUTION AT THE SENTENCING PHASE OF TRIAL**

At the sentencing phase of trial, the prosecution called Gerry Martin, who was Grace Blackwell's daughter and only child, to testify about her relationship with her mother. The jury also heard from Martin's daughters, Amber Arnold and Crystal Moulds. Moulds testified that she had three children of her own, one of whom was quite young. During closing argument, one of the prosecutors argued that, if the jury allowed Gray to live, he would be able to maintain a relationship with his family.

He will be able to talk to them, visit with them, communicate with them, and enjoy certain things, but Grace Blackwell's family, their only relationship with her will be their memories of her, their prayers, and visiting her in the graveyard.

Grace Blackwell had a great-grandchild that she will never know.  She has got a daughter, grandchildren, great-grandchildren, that have been cheated out of years.

Defense counsel objected to the prosecutor's remarks.  The trial judge sustained the objection but did not instruct the jury to disregard it.

This claim was rejected by the Mississippi Supreme Court on direct appeal.  *Gray*, 728 So. 2d at 54-55.  The court noted that victim impact evidence could properly be admitted, pursuant to United States Supreme Court precedent.  *Id*. at 54 (citing *Tuilaepa v. California*, 512 U.S. 967, 976 (1994), and *Payne v. Tennessee*, 501 U.S. 808 (1991)).  Next, the court considered the entire closing arguments made by the prosecution during both the guilt and sentencing phases of trial and held that they did not deprive Gray of a fair trial, nor was it likely that they convinced the jury either to convict Gray or to sentence him to death.  *Gray*, 728 So. 2d at 55 (citing *Greer v. Miller*, 483 U.S. 756, 765 (1987)).

In his § 2254 petition, Gray argues that the Mississippi Supreme Court's decision misapplied both state and federal law.  He contends that, while victim impact evidence may be admissible in certain situations, it must be relevant to one of the aggravating circumstances.  According to Gray, the comments made by the prosecutor in his case were not related to the circumstances of the crime, but were inflammatory statements made solely to prejudice the jury's deliberation on the appropriate sentence.  To demonstrate the affect of the arguments, Gray relies on the relatively short time (approximately one hour) before the jury returned a sentence of death.  Gray's argument is unpersuasive.  In *Payne*, the Supreme Court overruled *Booth v. Maryland*,

482 U.S. 496, 507 (1987), which held that victim impact evidence was inadmissible except where the evidence was directly related to the circumstances of the crime, and *South Carolina v. Gathers*, 490 U.S. 805, 811-12 (1989), extending *Booth* to prosecutors' comments at closing.

*Payne*'s approval of victim impact evidence was not without some limitations, as it overruled *Booth* and *Gathers* only to the extent that they held that "evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing." 501 U.S. at 830 n.2. The opinion left untouched *Booth*'s preclusion of evidence from a victim's family as to their opinion of the crime, the defendant, or the appropriate sentence. *Id*. Moreover, to the extent that the evidence goes beyond the purpose of individualizing the victim and becomes "so unduly prejudicial that it renders the trial fundamentally unfair," the defendant may still challenge it under the Due Process Clause of the Fourteenth Amendment. *Id*. at 825 (citing *Darden*, 477 U.S. at 179-83).

Gray has not cited *Payne*, discussed its impact on his argument, or attempted to distinguish the holding from the facts in his case. Instead, he focused on the prosecutor's comments rather than any actual testimony from Blackwell's family. *Payne* overruled *Booth*'s preclusion of victim impact testimony; it also overruled *Gathers*'s prohibition against a prosecutorial argument based on that testimony. 501 U.S. at 827 ("For the reasons discussed above, we now reject the view – expressed in *Gathers* – that a State may not permit the prosecutor to similarly argue to the jury the human cost of the crime of which the defendant stands convicted.") Thus, the prosecutor's reference, in closing argument in Gray's case, to properly admitted victim impact testimony is permitted by *Payne*.

Gray contends that the Mississippi Supreme Court's opinion unreasonably applied *Tuilaepa v. California*, 512 U.S. 967, 976 (1994), which held that "our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty." *Id.* The state court held that the victim impact evidence presented in Gray's case was part of the circumstances of the crime and, therefore, admissible under *Tuilaepa*. *Gray*, 728 So. 2d at 54. In *Payne*, the testimony complained of was from the grandmother of a child who survived a knife attack that killed his mother and sister. Although the surviving child was present during the murder, and severely injured by the defendant, the Supreme Court did not indicate in the opinion that his feelings about the event of the loss of his family was a circumstance of the crime. However, on habeas corpus review, the test is not whether language in the state court's opinion was incorrect or erroneous, but whether the state court's decision was objectively unreasonable. *Wiggins*, 539 U.S. at 520-21; *Williams*, 529 U.S. at 407. As stated earlier, a state court's decision cannot be the basis of habeas corpus relief under the language of AEDPA unless its reasoning or its result contradicted federal law that has been clearly established by the United States Supreme Court. *Early*, 537 U.S. at 8. The state court decision is not in conflict with *Payne.* Thus, Gray's argument on *Tuilaepa* is unpersuasive.

Gray also contends that the prosecutor's comment was "deliberate, extensive, and highly prejudicial to Gray." If this argument is intended to fall within the ambit of *Darden*, it falls well short of the mark. Where a statement made by the prosecutor during argument is challenged by way of collateral review, the appropriate standard of review is not whether the comment was improper or worthy of condemnation, but whether it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. In that

24

review, the court must consider that the remark "is but one of several components of the trial

which may result in the judgment of conviction." *Id*. at 645.  In *Darden v. Wainwright*, 477 U.S.

168 (1986), the Court was presented with several statements made by the prosecutor during

closing argument that arguably required reversal:

> As far as I am concerned, there should be another Defendant in the courtroom, one more, and that is the division of corrections, the prisons . . . . Can't we expect him to stay in a prison when they go there?
>
> I will ask you to advise the Court to give him death.  That's the only way that I know that he is not going to get out on the public.  It's the only way I know.  It's the only way I can be sure of it.  It's the only way that anybody can be sure of it now, because the people that turned him loose.
>
> As far as I am concerned, and as Mr. Maloney said as he identified this man this person, as an animal, this animal was on the public for one reason.
>
> He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash. . . .  I wish [one of the victims] had had a shotgun in his hand when he walked in the back door and blown his [the defendant's] head off.  I wish that I could see him sitting here with no face, blown away by a shotgun. . . . I wish someone had walked in the back door and blown his head off at that point. . .  He fired in the boy's back, number five, saving one.  Didn't get a chance to use it.  I wish he had used it on himself.  I wish he had been killed in the [subsequent auto] accident, but he wasn't.  Again, we are unlucky that time.

Only after the last comment did defense counsel object to the argument.  477 U.S. at 181 nn.9-

12.  The Court affirmed the conviction in that case, noting that the trial court instructed the jurors

that the comments of counsel were not evidence.  Additionally, two victims of the crime survived

and gave eyewitness testimony identifying the defendant as the assailant, another witness

described his car, and, after the car was later involved in an accident, a gun with a misfired shell

in the chamber was found near the scene, later described as the same type of gun that killed the

third victim.  This "overwhelming evidence," in the Court's opinion, made it unlikely that the

jury's verdict was influenced by this argument, however ill-advised.  *Id*. at 182.  *See also Ward v. Whitley*, 21 F.3d 1355, 1365 (5th Cir. 1994) ("The argument that Ward was a bad person deserving of death . . . pales beside the other evidence of his bad character . . .")

Here, the prosecutor made two brief statements.  The first statement compared the ability of Gray's family to maintain contact with him while he was in prison, as opposed to the inability of Blackwell's family to visit her any place other than the graveyard.  The second statement noted that Blackwell's "daughter, grandchildren, great-grandchildren . . . have been cheated out of years . . ."  Defense counsel objected to the second statement, stating, "This is not proper as to this crime that was committed."  That objection was sustained by the trial judge, although he declined to order the jury to disregard the statement.

Earlier in the sentencing phase, one of Blackwell's granddaughters testified about her hopes that her children would enjoy the same type of relationship with Blackwell as she had, saying, "I thought how wonderful it was that they were going to have the same experience that my sister and I had with her, all the love and attention she had always given us . . ."  The prosecutor's comment during closing was a valid argument based on that testimony.  To the extent that Gray's objection was based on the pre-*Payne* federal law that victim impact testimony had to be related to the circumstances of the crime, it should not have been sustained.  To the extent that the objection and the trial court's ruling were based on some understanding of Mississippi law to the contrary, no federal constitutional right has been implicated.  As the Supreme Court has made clear, in the context of habeas corpus review, " mere errors of state law are not the concern of this court, unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution."  *Barclay v. Florida*, 463 U.S.

26

939, 957-58 (1983); *see also Richmond v. Lewis*, 506 U.S. 40, 50 (1992).  A federal court considering a habeas corpus petition does not sit as a super state supreme court to review error under state law.  *Wood v. Quarterman*, 503 F.3d 408, 413-14 (5th Cir. 2007).

Finally, the state prosecutor's brief comments do not rise to the level of the inflammatory rhetoric found in *Darden*.  Given the overwhelming evidence against Gray, as well as the nature of the crime and the injuries inflicted on Blackwell, it cannot be said that this argument so infected Gray's trial with unfairness that it resulted in a denial of due process.  The Mississippi Supreme Court's decision was neither an unreasonable application of, nor contrary to, clearly established federal law.

## E.  THE IN-COURT IDENTIFICATION

Harry Jones testified that he saw Blackwell's car stopped on Turkey Creek Road. According to Jones, a young black man in the car "was wrestling with this lady."  Jones could only see the top of the passenger's head, because she was slumped in the seat.  Jones stated that from a distance of about twenty feet, the young black man looked directly at him, then drove away.[5]

Before Jones could identify Gray at trial, Gray's counsel objected.  Outside the presence of the jury, Jones testified on cross-examination that he did not recognize the car on the day that he saw it; however, the next day, he saw the car on television.  Jones went to the Sheriff's Department to report what he had seen.  Officers there showed him six or seven photographs, and

---

[5]At least one additional witness remembered seeing Blackwell's car on after it was seen at the Bank of Louin.  Richard Weir testified at trial that he saw Blackwell's car around noon that day. He stated that although he could not identify the car occupants, he observed a black male driver and a white female passenger.  Weir also stated that the driver "looked like he was trying to grab her." According to Weir, the car was heading toward Turkey Creek Road.

some of them were of people that Jones knew.  Jones did not see the driver in any of them.

Officers then brought Gray into a room by himself and asked Jones to view him through a

"peephole."  Jones identified Gray as the driver of the Chrysler.  Still outside the jury's presence,

during re-direct, Jones stated that his in-court identification of Gray was based upon what he saw

on the road the day of the murder and not based on viewing Gray at the jail.  After this testimony,

Gray's attorneys objected to Jones's identification of Gray as being tainted by the viewing at the

jail.  The trial judge ruled as follows on the objection:

> I fail to see how it can be argued that an impermissible lineup distorted this witness's identification, because according to his testimony, he saw photographs of those, and he knew most of those persons that he saw, and then immediately he was shown the Defendant through a peephole, and he made identification.
>
> His identification in the Courtroom here is a positive identification.  He testified that it was not assisted by the showing of the photographs or viewing the Defendant through a peephole, but it was based entirely upon his viewing the Defendant at the scene.
>
> The witness stated it was some twenty to thirty feet the Defendant was away from him, and that he looked directly at him.
>
> So, your Motion to suppress is denied.

The jury was brought in to consider the remainder of Jones's testimony.  Jones repeated his

testimony and identified Gray as the man in the car.  He told the jury that his identification was

based on what he saw on the road that day.

Gray argued on appeal that it was error to permit Jones to identify him at trial, on grounds

that the photographic "lineup" was impermissibly suggestive.  The Mississippi Supreme Court

analyzed Gray's claim using the following methodology:

> The standard of review for suppression hearing findings in a matter of pretrial identification cases is whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted. [cites omitted]. The appellate review should disturb the findings of the lower court "**only where there is an absence of substantial credible evidence supporting it.**" [Emphasis added]. *Ray v. State*, 503 So. 2d at 224.

*Gray*, 728 So. 2d at 68. (quoting *Ellis v. State*, 667 So. 2d 599, 605 (Miss. 1995)). The court went on to review Gray's identification issue with reference to two cases decided by the United States Supreme Court – *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) and *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). From *Manson*, the state court discerned, "Reliability has been deemed the linchpin in determining the admissibility of the identification testimony." *Gray*, 728 So. 2d at 68. From *Neil*, the court excerpted five factors to consider in determining reliability:

1.      Opportunity of the witness to view the accused at the time of the crime;

2.      The degree of attention exhibited by the witness;

3.      The accuracy of the witness's prior description of the criminal;

4.      The level of certainty exhibited by the witness at the confrontation;

5.      The length of time between the crime and the confrontation.

*Id.*(citing *Neil*, 409 U.S. at 199-200). The Mississippi Supreme Court then made the following findings:

> Applying the factors set forth in *Neil* to the present case the following is clear:
>
> 1.      **Opportunity to view the accused-**
> Jones testified that the car was stopped when he first approached it, but the driver took off. He stated that the driver looked straight at him before driving away. Jones stated that he got a good look at the man, because he was about twenty feet away from Gray when he saw him.
>
> 2.      **Degree of attention-**

29

Jones stated the persons in the car attracted his attention because they appeared to be wrestling.  Jones said he figured it was a boyfriend and girlfriend fighting.

3.      **Accuracy of prior description-**
Jones described the driver of the car as a young, black man.  He stated that he saw the individuals in the car around noon time.

4.      **Witness' level of certainty at confrontation-**
Jones immediately identified the person shown to him through the peephole as the person who he had seen driving Mrs. Blackwell's car.  That individual was Rodney Gray.  Jones stated that he based his in-court identification of Gray based on what he saw "out on the road" on the day Mrs. Blackwell was murdered, not what he saw at the jail.

5.      **Length of time between the crime and the confrontation-**
Jones stated that he recognized the car when he saw it on the news the day after Mrs. Blackwell was murdered.  He contacted the law enforcement officials to report what he had seen.  He identified Gray the same day, which was the day after he had seen him driving Mrs. Blackwell's car.

*Gray*, 728 So. 2d at 68-69.  Based on these findings, the court held that, even if the show-up identification of Gray based on Jones's viewing him through the peephole was impermissibly suggestive, the in-court identification of Gray was sufficiently reliable to be admissible.  *Id*. at 69.

Gray contends that the trial court did not properly analyze the facts under the five-step *Neil* analysis outlined above.  He further argues that the Mississippi Supreme Court's analysis under *Neil* failed to adequately consider the actual facts in the record and incorrectly applied the relevant case law.  Finally, Gray argues that the state court improperly distinguished *Foster v. California*, 394 U.S. 440 (1969).

On habeas corpus review, the federal court defers to the state court's decision regarding factual determinations.  The state court's individual factual determinations are presumed correct, and that presumption can only be rebutted by clear and convincing evidence.  28 U.S.C. § 2254

(e)(1).  This presumption of correctness afforded to state court findings applies equally to those of trial and appellate courts.  *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).  Habeas corpus relief will only be granted on factual claims where the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(2).  Thus, this Court must defer to the findings made by the Mississippi Supreme Court, unless they are not fairly supported by the evidence presented to the trial court.  *Parker v. Dugger*, 498 U.S. 308, 320 (1991).

A review of the record in this case shows that the trial judge and the appellate court reached roughly the same findings, although the Mississippi Supreme Court's findings were more detailed.  They do not contradict each other, and all of the findings are supported by the record.  Both courts found that, at twenty to thirty feet from Gray, Jones was sufficiently close to view him.  They found that Gray looked straight at Jones before Gray drove away.  Both courts found that Jones did not identify Gray from photographs, but identified Gray immediately after Jones looked through the peephole.  Both the trial and appellate courts acknowledged that Jones's in-court identification was based on his observations at the scene on the day of the events.  The Mississippi Supreme Court additionally found that Jones's attention was drawn to Gray when he was in the car because he was wrestling with his passenger.  Jones saw Gray at noon, and he had a sufficient view of the Chrysler to recognize it on television the day after the crime, which was the same day that he identified Gray at the jail.  Moreover, Gray has failed to produce clear and convincing evidence that tends to show that trial and appellate court findings were unreasonable, in light of the evidence presented at trial.

Gray also maintains that the state courts misapplied the law to the facts of his case. A "show up," where only a single person is shown to a witness for the purpose of identification, is impermissibly suggestive, except under the most extraordinary circumstances that have not been argued in this case. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). However, the improper identification procedure does not, necessarily, preclude the witness from testifying at trial, provided that other evidence shows that the identification is reliable. *Amador v. Quarterman*, 458 F.3d 397, 413-14 (5th Cir. 2006). The two cases under which reliability is analyzed are *Brathwaite* and *Neil*. *Amador*, 458 F.3d at 413. The Mississippi Supreme Court relied on this established federal precedent. Gray has not shown that the court's decision was contrary to or a misapplication of the law.

Finally, Gray contends that the Mississippi Supreme Court failed to properly apply *Foster v. California*, 394 U.S. 440 (1969). He argued on appeal that his case should be governed by *Foster*, and the Mississippi Supreme Court disagreed, stating, "The case presently before the court is clearly distinguishable. Jones made a positive identification immediately upon being shown Gray through the peephole. Even if the show-up identification was impermissibly suggestive, the reliability of the in-court identification is evident from the record." *Gray*, 728 So. 2d at 69. In *Foster*, a pre-*Neil* case, police orchestrated repeated line-ups that so suggestively singled out the accused that the Court found that, "[i]n effect, the police repeatedly said to the witness, 'This is the man.'" 394 U.S. at 443. Cases decided after *Neil* have recognized a "bipartite inquiry," where, after finding that the identification procedure was impermissibly suggestive, the court must also "determine whether there was a substantial likelihood of misidentification." *Preacher v. Estelle*, 626 F.2d 1222, 1223 & n.3 (5th Cir. 1980) (citing *Allen*

32

*v. Estelle*, 568 F.2d 1108, 1111 n.5 (1978)).  The Mississippi Supreme Court did just that –

finding that, even if the show up was impermissibly suggestive, other circumstances existed that

made the identification reliable.  The Mississippi Supreme Court identified the controlling

United States Supreme Court precedent and properly applied the law to factual findings that are

supported by the record.

## F.  The Inculpatory Jailhouse Statements

After he was arrested, Gray was held in Jasper County with another inmate Russell

Saunders.  Saunders testified that after having his blood drawn, Gray returned to the cell and

asked Saunders and other inmates whether a blood sample could reveal whether the donor had

sex with a woman.  Saunders testified that Gray told them that he had sex with the woman he

was alleged to have killed, but that he shot her accidentally.  According to Saunders, Gray told

them that he had run over the victim, smashed the gun and thrown it into the woods.  Saunders

also testified that Gray told him that the money that he had taken from the woman was hidden in

some vents.  Saunders was cross-examined by defense counsel, who questioned him about his

promotion to trustee about two months after he reported the conversation with Gray.  Saunders

admitted the change in his status, but said, "[S]ee, you can't be a trusty unless you have your time

. . . ."  Saunders denied being asked by law enforcement to monitor Gray's conversations, but he

admitted that he was a "snitch."

Cleveland McCall was held with Gray after Gray was transferred from Jasper County to

Newton County.  McCall testified that Gray admitted to him that he killed Blackwell.  According

to McCall, Gray told him he took Blackwell to the bank to get some money, brought her back,

raped her, and shot her with a .410 shotgun.  McCall stated on direct examination that the auto

theft charges on which he was jailed were subsequently dropped but said that it was because the

owner of the car failed to prosecute.  This testimony was repeated on cross-examination, where

McCall also admitted his criminal history and admitted to being a "snitch."

Gray argues that the testimony was likely perjured, as he contends that each witness

obtained favorable treatment from the State after testifying. Gray also maintains that he is

entitled to an evidentiary hearing in this Court to determine the veracity of these witnesses and

whether admission of their testimony violated his constitutional rights.

Gray raised the introduction of these inculpatory statements both on direct appeal and in

his petition for post-conviction relief.  On direct appeal the Mississippi Supreme Court denied

relief on several grounds.  First, the court found that Gray cited no authority to support his

argument that such testimony is disfavored as historically unreliable.  *Gray*, 728 So. 2d at 71.

Second, the court held that the issue was procedurally barred because Gray did not object to the

witnesses' testimony at trial.  *Id*. at 72.  Third, the court held that the trial record did not establish

that the witnesses received anything in return for their testimony.  Fourth, the court held that

Gray was barred from raising the issue because he did not request a cautionary instruction by the

trial court.  Finally, the court noted that Gray was permitted to cross-examine each witness and

argue each witnesses' lack of reliability to the jury. *Id*.  In the state court petition for post-

conviction relief, Gray contended that his trial counsel had rendered ineffective assistance for

failing to prevent his cell-mates' testimony at trial.  *Gray v. State*, 887 So. 2d at 166.  The court

recognized that its earlier opinion had held the argument to be both procedurally barred and

substantively without merit.  Thus, it denied relief, holding, "Since the Court has previously

considered this issue both procedurally and on the merits and no new evidence has been provided

34

in the petition for post-conviction relief, the doctrine of res judicata applies and bars reconsideration." *Id*. at 167.

Gray argues here that the use of these confessions violated his Fourteenth Amendment rights, citing *Arizona v. Fulminante*, 499 U.S. 279 (1991).  He also argues that, by creating a situation that induced him to make incriminating statements without counsel, his Sixth Amendment rights have also been violated, citing *United States v. Henry*, 447 U.S. 264 (1980). Gray contends that an evidentiary hearing is required to insure that the State did not knowingly use perjured testimony, citing *Kuhlmann v. Wilson*, 477 U.S. 436 (1986), and *Miller v. Pate*, 386 U.S. 1, 7 (1967).  He also maintains that the admission of this testimony cannot be considered as harmless error.  *Chapman v. California*, 386 U.S. 18, 24 (1967).  Although Respondents argue that the issue is procedurally barred, Gray contests Respondents' assertion by arguing that the state court reached the issue on the merits, that the issue implicates fundamental rights that should be addressed despite the bar, and that his argument of ineffectiveness established cause for the default.

A procedural bar will not prevent habeas corpus review of an issue unless the last state court that ruled on the claim "clearly expressed its reliance on an adequate an independent state law ground . . . ."  *Harris v. Reed*, 489 U.S. 255, 263 (1989).  Thus, a general statement that some of a petitioner's allegations could have been raised on direct appeal will not suffice.  *Id*. at 266.  Where a state court has clearly expressed its reliance on a procedural bar, however, the fact that it alternatively rules on the merits will not vitiate the bar's validity.  *Hughes*, 412 F.3d at 592; *Thacker v. Dretke*, 396 F.3d 607, 614 n.8 (5th Cir. 2005).  Here, the Mississippi Supreme Court clearly stated at the outset of its opinion that this claim was procedurally barred because

35

Gray had not presented the issue to the trial court.  The court clearly expressed its reliance on the procedural bar to deny relief.  As noted earlier, an alternative discussion of a claim on the merits does not constitute a waiver of reliance on a procedural bar.  *Hughes*, 412 F.3d at 592.

The doctrine of procedural default in a habeas corpus case also presumes that a state procedural ground is adequate and independent – the rule must, for instance, be regularly followed – and, ordinarily, the burden is on the habeas corpus petitioner to demonstrate otherwise.  *Coleman v. Thompson*, 501 U.S. at 750; *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999).   Having failed to object to this testimony, Gray cannot use it as grounds for habeas corpus relief in this Court, unless he can find another means of overcoming the procedural bar.  He attempts to do so by contending that his trial counsel was ineffective in failing to object to this testimony.  The standard for ineffectiveness claims requires a showing of defective performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  As more fully discussed below, Gray's claim of ineffectiveness is unpersuasive.  He cannot show that he was prejudiced by his counsel's performance, because an objection to the testimony was not warranted.  Prejudice cannot result from counsel's failure to assert a meritless claim or make a meritless argument.  *See Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006).  Gray has not shown that his attorneys were ineffective, therefore, he cannot overcome the procedural bar that prevents consideration of this issue.

Gray relies on *Arizona v. Fulminante*, 499 U.S. 279 (1991), to argue that the use of these jailhouse confessions violated his Fourteenth Amendment rights.  In *Fulminante*, the murder victim was an eleven year old girl.  The suspect was her stepfather, who was incarcerated on another charge with former police officer Anthony Sarivola.  Sarivola told Fulminante that he

36

knew about the rough treatment Fulminante was getting from other inmates, because of the nature of the accusations against him.  In return for protecting him from the other inmates, Sarivola told Fulminante that he needed to know what happened.  Fulminante confessed the murder to Sarivola, but later moved to suppress that confession, on grounds that it was coerced.

The Supreme Court agreed with Fulminante, holding that, although the issue was close, the state court's finding of a "credible threat of physical violence" should be affirmed.  *Id*. at 285. In so doing, the Court noted that the appropriate test to determine coercion involves consideration of the totality of the circumstances surrounding the confession.  *Id*. at 285-86. Aside from the threat to Fulminante's safety, the Court also considered his slight stature, his prior difficulties in adjusting to prison life, his friendship with Sarivola, and his lack of education. Based on these factors, the Court determined that the confession had been coerced.  *Id*. at 286, n.2.  *Fulminante* does not apply to Gray's case.  Gray does not argue that his confession was coerced.  Instead, he argues that the other inmates' testimony was likely untruthful and procured by inducements from the authorities to those witnesses.

Gray's reliance on *United States v. Henry*, 447 U.S. 265 (1980), is similarly misplaced. In *Henry*, the accused was incarcerated with a paid informant for the Federal Bureau of Investigation, who had been instructed not to ask questions of or initiate conversations with his fellow inmates, but to "pay attention" to any statements that they made.  After the agent had ingratiated himself to Henry (to the point where Henry asked him to help in an escape attempt), Henry told this inmate about the bank robbery for which he was later convicted.  The agent passed this information on to the FBI, and he was paid for furnishing it, pursuant to a pre-arranged fee agreement.  Holding that, under these conditions, the informant was an agent of the

FBI, the Supreme Court found that the Government had "intentionally creat[ed] a situation likely to induce Henry to make incriminating statements without the assistance of counsel . . . ." *Id*. at 274.  Thus, Henry's Sixth Amendment right to counsel had been violated by admission of the confession at trial.  *Henry* is both factually and legally distinguishable from Gray's case.  First, there is no evidence that either Saunders or Cleveland were agents of the State.  Saunders testified that neither the Sheriff nor any other officer asked him if Gray was telling him about the crime.  He testified that he received nothing in exchange for his testimony and that he achieved the status of trustee simply because he had served enough time to merit that status.  McCall testified that no officer had asked him to try to get information from Gray, nor was he promised anything to do so.  He further stated that the reason that the charges against him had been dropped was that the accusing party did not pursue them.

Gray argues that he is entitled to an evidentiary hearing "to make a determination of offers made to the inmates prior to their conversations with Gray, and whether the inmates approached Gray seeking a confession on behalf of the prosecution."  The Mississippi Supreme Court reviewed that testimony and found nothing to indicate that the inmates' testimony was tainted by promises of favorable treatment.  *See Gray*, 728 So. 2d at 72 ("The evidence in the record before the Court does not establish the inmates received anything in exchange for their statements." )  This finding is entitled to a presumption of correctness under 28 U.S.C. § 2254 (e)(1).  Gray offers nothing to challenge the finding except his subjective belief that these witnesses lied.   Having failed to offer clear and convincing evidence that the state court's finding was incorrect, Gray is not entitled to an evidentiary hearing for the mere purpose of

rehashing the historical facts surrounding the confessions. *Thompson v. Keohane*, 516 U.S. 99, 107-10 (1995) (interpreting 28 U.S.C. § 2254(d), which has been superseded by § 2254(e)(1)). The state court's decision to allow the testimony was neither an unreasonable application of, nor contrary to, clearly established federal law.

Finally, the Court addresses Gray's Sixth and Fourteenth Amendment claims. The State violates a criminal defendant's Sixth Amendment right to counsel whenever it deliberately elicits incriminating statements from him through the use of a government agent, outside the presence of the accused's attorney, at a time when he has the right to counsel. *Massiah v. United States*, 377 U.S. 201, 206 (1964). The agent can be an actual officer or another who is acting on behalf of law enforcement and "stimulates" conversation with the accused. *Henry*, 477 U.S. at 274. In such a situation, the Supreme Court has held, law enforcement has managed a "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann*, 477 U.S. at 459. In *Kuhlmann*, a confession was made to a fellow inmate who was not a government agent, although he had been told to listen to anything the accused might say. The Court held there was no constitutional violation, distinguishing the case from *Henry*. Noting that the inmate had merely listened to the accused's statements about the case, the Court recognized that the Sixth Amendment was not violated when the State, "by luck or happenstance . . . obtains incriminating statements from the accused after the right to counsel has attached." *Id*. (quoting *Maine v. Moulton*, 474 U.S. 159, 176 (1985)). Here, Gray apparently made at least one of these comments prior to his indictment for killing Blackwell; he had no Sixth Amendment right to counsel at that time. Even if he did, he has not shown that either Saunders or McCall

was a state agent who solicited his confession.  Thus, the decision of the Mississippi Supreme

Court was not contrary to, or an unreasonable application of, this line of cases.

The State violates a criminal defendant's Fourteenth Amendment right to due process

when it coerces a confession that is used against him at trial.  *Fulminante*; *Malloy v. Hogan*, 378

U.S. 1, 9 (1964).  Gray has not contended thus far that his confession was coerced.  In fact, there

is no evidence in the record to support such a claim.  The Mississippi Supreme Court's opinion

did not offend any United States Supreme Court precedent on the issue of voluntariness of a

confession.

In sum, Gray's claim that the admission of the testimony of Saunders and McCall

violated his federal constitutional rights is procedurally barred from consideration.  Alternatively,

the claims lacks substantive merit.

## G.  Speedy Trial Claims

Gray claims that he was incarcerated for an excessively long period prior to indictment.

Gray contends that this delay allowed the State to obtain the jailhouse confessions and witness

identification during a time when he was not represented by counsel on the murder charge.  He

also contends that, during this period, a witness died who "could have been helpful" to his case.

Gray therefore maintained that he had been denied his right to a speedy trial and his right to

counsel.

Gray originally raised this claim in the trial court, by the filing of a motion to quash the

indictment.  The motion stated that Gray was taken into custody on the day of the murder, August

15, 1994.  He was not charged with capital murder until March 15, 1995, and counsel was not

appointed to represent him on the murder charge until March 22, 1995.  The trial court held a

hearing on this motion prior to trial.  Three witnesses testified at that hearing including the

Sheriff of Jasper County, Mississippi, the Sheriff of Newton County, Mississippi, and Gray's

mother.  Their testimony established that, at the time of Blackwell's murder, Gray had separate

charges pending against him in Newton County, Mississippi, for possession of cocaine and

firearms.  When Gray was arrested in Newton County on August 15, 1994, his bond on the drug

and firearms charges was returned.  A few days after his arrest, Gray was transported to Jasper

County and charged with the burglary of Blackwell's house.  An initial appearance was

conducted, and an attorney was appointed for Gray on the burglary charge.  At that proceeding,

bond was set for Gray; however, he never posted the bond, so he remained incarcerated in Jasper

County.  (As of the time of the hearing on the motion to quash, Gray still had not been indicted

for the burglary.)  Gray remained in the Jasper County Jail until March 15, 1995, when he was

transferred to Newton County.  He was briefly returned to Jasper County the following

September, where he pleaded guilty to two burglaries and one attempted burglary, none of which

was related to Blackwell's murder.  Gray was sentenced to three years imprisonment on each

charge.

Apparently, there was discussion between Jasper and Newton County authorities on who

should assume jurisdiction over Gray's case.  Evidence showed that Blackwell was kidnaped (or

car jacked) in Jasper County during a burglary of her home, but she was likely raped and

murdered in Newton County.  To identify the perpetrator, however, authorities wanted the results

of the DNA testing.  The Sheriff of Newton County testified that the delay in charging Gray with

capital murder was caused by the delay in obtaining the results of the DNA testing.  Those results

were accompanied by a partial report.  Due to a delay in receiving the full report, Gray was not indicted for Blackwell's murder until August 2, 1995.

Gray's mother Annie Tatum testified that she visited her son every Sunday when he was in jail.  She said that Gray was always nervous and upset in jail, and he twice tried to commit suicide.  She stated that Gray told her that Latrelle Page could clear him of the charges.  Page was killed in an automobile accident in May, 1995.  When asked what Page's testimony would be, Tatum said that he "knew what happened."  On cross-examination, Gray's mother admitted that her son was represented by counsel on the burglary charges, as well as the murder charges, during the time that he was incarcerated.  She testified, however, that Gray never got to talk his lawyer.

The trial court denied the motion to quash, analyzing the motion under the rationale of *Barker v. Wingo*, 407 U.S. 514 (1972), and making this ruling from the bench:

> The Court, in reviewing the evidence, finds that there was a delay of 257 days, being that time from the date of the charge on March the 15th, 1995, until the date of trial, which is now set for trial November the 27th, 1995, being a period shortly in excess of eight months, requiring the Court then, after determining there was a length of delay, to apply the test and determine the reason for that delay.

> It appearing from the evidence that during this period of time, the serology materials were turned over to the Federal Bureau of Investigation for analysis, and that immediately upon receipt of a partial report, the Sheriff of this county filed charges.

> The delay of discovery being negligent does not appear to be prejudicial and does not weigh heavily against the State, although the Court must find that it does weigh against the State.

> The second test of whether or not the Defendant asserted his right to trial weighs against the Defendant, for the record appears that he did not assert that he was entitled to the right to be tried on the crime for which he was charged.

Before I get away from it, I want to say the DNA analysis being conducted by [the] Bureau could have been exculpatory and beneficial to the Defendant. Therefore, that weighs against the Defendant and whether or not he was prejudiced by the delay.

Contrary to the argument of the Defendant, the crimes for which this Defendant was convicted in the intervening time were crimes that he had committed prior to the burglary, kidnaping, and/or rape and murder of the lady on August the 15th, 1994, so I fail to see how he can contend that the delay in his trial caused him to be convicted of a crime for which he had committed [sic] prior to the date alleged in this particular instance.

It is not clear, and it was not made clear, and the question was asked of the witness, what was the testimony of the person deceased, and there was no response to that question. Therefore, it has not been made clear to the Court what that witness would have testified to. Therefore, the Court would not be in a position of ruling whether or not the delay was prejudicial to the Defendant.

Considering, therefore, the prejudice by delay weighs against the Defendant, and application of the test of the *Barker v. Wingo*, I find that it weighs against the Defendant.

Therefore, the motion is overruled.

Gray raised this issue on appeal to the Mississippi Supreme Court, which found that he was not tried for Blackwell's murder until 525 days had passed since his arrest for burglary. *Gray*, 728 So. 2d at 47. However, that court held that the relevant time period was the time that had elapsed from March 15, 1995, the date of his arrest, until November 17, 1995, when Gray moved to continue his trial, which was 247 days. The court further held that, as the period was longer than eight months, the delay was presumptively prejudicial to Gray, and the State had to show that he had not been denied his right to a speedy trial.

Analyzing the case under the familiar standard of *Barker v. Wingo*, 407 U.S. 514 (1972), the court recognized that it had to review three other factors: (1) the reason for delay; (2) whether Gray had asserted his right to a speedy trial; and (3) prejudice. *Gray*, 728 So. 2d at 48.

43

Examining the first factor, the court considered the State's claim that it delayed charging Gray because it was waiting for lab results from the FBI.  Citing an earlier case, the court held that, because those results were potentially exculpatory, the delay would not weigh heavily against the State.  *Id*. at 48 (citing *Hull v. State*, 687 So. 2d 708, 730 (Miss. 1996)).  With regard to the second factor, the court held that, by filing a motion to quash the indictment, rather than a request for a speedy trial, Gray had not effectively asserted his right to a speedy trial.  *Gray*, 728 So. 2d at 48.

Finally, the court reviewed the third factor, prejudice, which required an examination of the interests that the speedy trial right is intended to protect: "(I) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."  *Id*. (quoting *Barker*, 407 U.S. at 532).  In considering Gray's pretrial incarceration and related anxiety, the court held that the period from his arrest until March 15, 1995, was the result of his burglary charge.  "He would have been released upon making bail, only to be incarcerated in Newton County on a felony drug charge."  *Id*. at 49.  The court further found that the period of time from March 15, 1995, until Gray's trial was continued on November 17, 1995, did not constitute oppressive pretrial incarceration.  *Id*.  Regarding the issues of prejudice, the court determined that Gray's claim that he lacked counsel was unfounded, since he had counsel on the burglary charge, and he was not entitled to counsel on the murder charge until March, 1995.  On Gray's claim that he was prejudiced by the death of Latrelle Page, the court noted the lack of evidence as to what his testimony would have been.  "There can be no prejudice to the defendant when the possibility is insubstantial, speculative and premature."  *Id.*

44

at 50. The court further found that Gray had counsel for two months prior to Page's death, and

his failure to secure the witness was fatal to his claim of actual prejudice.

Gray also argued that he was prejudiced by the State's ability to procure confessions

through McCall and Saunders. The court concluded that the claim was without merit, noting that

he was represented by counsel – either on the burglary or capital murder charges – at the time of

each confession. *Id*. Another argument that was ultimately resolved in the State's favor was

Gray's claim that he was prejudiced by pleading guilty to unrelated felonies in September, 1995,

which made him a convicted felon for purposes of cross-examination. Finding that Gray was

represented by counsel at that time, the court held that the factor weighed against him on the

issue of prejudice.

The court also discounted Gray's claim that the State intentionally delayed indictment so

that authorities could obtain incriminating evidence before he was represented by counsel. The

State countered with a United States Supreme Court case that held that, although other

constitutional rights could be implicated by such a delay, the right to a speedy trial did not

require a state to formally charge an accused within any particular period of time. *Id*. (citing

*United States v. Marion*, 404 U.S. 307 (1971)). The court held, "Gray has failed to show that the

State intentionally held back its prosecution in order to gain some impermissible advantage at

trial. Where the delay is not intentional and there is no showing of actual prejudice, the balance

should be struck in favor of rejecting Gray's speedy trial claim." *Gray*, 728 So. 2d at 51.

Gray's petition in this Court does not clearly present a claim that his speedy trial rights

were violated. Instead, his argument appears to be addressed to his pre-indictment incarceration.

For purposes of clarity, Gray's status, and the rights associated with that status, can be analyzed

in two different stages: (1) the time between his arrest on August 15, 1994, and his being charged

with capital murder on March 15, 1995; (2) the time between the charge of capital murder on

March 15 and Gray's motion for a continuance on November 17, 1995.  During each of these

stages, Gray had a different relationship with the court and the prosecution, and he was entitled to

differing degrees of protection.

A time line of the events that occurred during this period is set out below:

Phase 1 -Arrest through Murder Charge (212 days)

| | |
|---|---|
| August 15, 1994 | Gray taken into custody by Newton County Sheriff |
| | Gray admits burglary of Blackwell's home (in Jasper County) and is charged |
| August 16 | Harry Jones comes to Newton County Jail to say he saw Blackwell's car the day before, with two occupants "wrestling" |
| | Jones is shown photographic lineup; views Gray through "peephole" and identifies him |
| | Bonding company for prior Newton County charges returns $10,000 bond |
| August 16-19 | Further investigation in Newton County |
| August 19 | Gray transferred to Jasper County Jail |
| | Arraignment and appointment of counsel on burglary charge occur shortly thereafter |
| | Bond set on burglary charge |
| Aug 16-Sept 9 | Blood and hair samples taken from Gray |
| | Gray makes statement to Saunders after blood sample taken |
| September 9 | Evidence given to FBI Crime Lab |

| March 14, 1995 | Newton County Sheriff gets fax of partial lab results |

Phase 2 - Murder Charge through Continuance (247 days)

| March 15, 1995 | Gray transferred to Newton County Jail and charged with capital murder |
| March 22 | Appointment of counsel on capital murder charge |
| May | Latrelle Page killed in automobile accident |
| August 2 | Gray indicted for capital murder |
| September 6 | Gray pleads guilty to other burglaries in Jasper County |
| Oct-Nov | Gray makes statement to McCall |
| November 17 | Gray moves for a continuance |

The Mississippi Supreme Court opinion dealt primarily with Gray's assertion that his Sixth Amendment right to a speedy trial had been violated.  The court correctly found that Gray's speedy trial right did not accrue until March 15, 1995, the date on which he was formally charged with capital murder.[6]  Although he was incarcerated several months earlier, an incarceration for a different offense will not trigger the speedy trial right.  *Cowart v. Hargett*, 16 F.3d 642, 645-46 (5th Cir. 1994).  To the limited extent that the state court discussed Gray's incarceration from August, 1994, to March, 1995, it held that period of time to be attributable to the burglary charge.

There is an exception to the general rule that pre-indictment incarceration on a different charge will not be considered an offense to the right to a speedy trial.  Where an accused has been arrested on one charge, and a subsequent charge merely "gilds" the initial charge, the speedy trial clock begins to run at the initial arrest.  *United States v. Bailey*, 111 F.3d 1229, 1236

---

[6]The *Barker* analysis is triggered by "arrest, indictment, or other official accusation . . . ." *Doggett v. United States*, 505 U.S. 647, 655 (1992).

(5th Cir. 1997).  A "gilded" charge "is one that merely annotates in more detail the same charge alleged in the initial accusatory instrument . . . ."  *Id*.  Gray appears to argue that, because his initial arrest for burglary and his subsequent charge of capital murder arose from the same event, the speedy trial calculation should include the time of his pre-March confinement.  However, it is not enough that the charges arose from the same event, they must be composed of the same elements.  *Id*.  Gray's capital murder charge alleged rape and kidnaping as the underlying crimes.  Those offenses require much different elements than the charge of burglary.  Thus, the murder charge did not "gild" the burglary charge, and the time Gray spent in the Jasper County Jail on the burglary charge is not a factor in the Sixth Amendment equation.

While Gray's right to a speedy trial on the capital murder charge did not exist before he was charged with capital murder, Gray was protected by the Due Process Clause from an inordinate pre-charge delay.  *United States v. Marion*, 404 U.S. at 324.  The test for determining whether such a delay has violated the constitutional rights of an accused is different from that employed under *Barker* and its progeny to analyze speedy trial rights.  The primary protection against excessive pre-indictment or pre-charge delay is the applicable statute of limitations; therefore, to find that a pre-charge delay has violated the accused's right to due process, the court must find that it "caused substantial prejudice to [his] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused."  *Id*.  The test was further defined in *United States v. Lovasco*, 431 U.S. 783, 789-90 (1977), when the Court emphasized that both elements must be found before a delay can be constitutionally infirm.  *Marion*, the Court explained, "makes clear that proof of prejudice is generally a necessary but not sufficient

48

element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* at 790.

In *United States v. Crouch,* 84 F.3d 1497, 1515 (5th Cir. 1996), the Fifth Circuit held that, for pre-indictment delay to violate the Due Process Clause, it must cause the accused actual, not presumptive, prejudice. The delay must also have been intentionally undertaken by the government to gain some tactical advantage over the accused or for some other impermissible, bad faith purpose, such as to eliminate evidence favorable to the defense or unfavorable to the government's case. *Id.* at 1514 n.23. To establish prejudice, the defendant must offer more than mere speculation of lost witnesses, faded memories or misplaced documents; he must show an actual loss of evidence that would have aided the defense and that cannot be obtained from other sources. *Id.* at 1515. The burden is on the defendant to prove both prongs of the test. *United States v. Avants,* 367 F.3d 433, 441 (5th Cir. 2004).

Pre-charge delay necessitated by the need for investigation "is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused.'" *Lovasco*, 431 U.S. at 795 (quoting *Marion*, 404 U.S. at 324). Thus, the Court held "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Lovasco*, 431 U.S. at 796; *United States v. Nixon*, 634 F.3d 306, 310 (5th Cir. 1981). At the pretrial hearing that was held in Gray's case, the pre-charge delay was explained. It was caused by the prosecution's waiting to get a report from the FBI's Crime Lab on the rape kit samples. This is the sort of investigative delay that cannot form the basis of a due process claim. Because Gray has failed to establish bad faith on the part of the prosecution, he cannot show that his due process rights were violated.

49

Additionally, Gray cannot show that the identification by Harry Jones and the statement to Saunders were instigated by the State.  Jones went to the Sheriff's Department on his own accord on the day after the crime, believing that he recognized Blackwell's car from its picture on the news.  His identification of Gray occurred at that time, when authorities were still in the initial stages of their investigation, and well before it could be reasonably expected that any defendant would be charged with capital murder.  Likewise, there is nothing to indicate that the statement made to Saunders, which occurred shortly after Gray was incarcerated, was anything but voluntary.   For these reasons, Gray has not established that the 273 days between his arrest and the formal charge of capital murder violated his right to due process.

The Mississippi Supreme Court held that the 247 days from the murder charge to the date that Gray moved to continue his trial did not deny him his Sixth Amendment right to a speedy trial.  Analyzing his claim under *Barker*, the court recognized its four-part test, beginning with a finding of presumptive prejudice, which "defines a threshold in the inquiry . . . ."  *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986).  The state court's finding, however, was made under state law, citing a case that indicated that a delay of over eight months is presumptively prejudicial.  *Gray*, 728 So. 2d at 47 (citing *Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989)).  That period has been used in later cases to determine presumptive prejudice.  *See, e.g., Stark v. State*, 911 So. 2d 447, 450 (Miss. 2005).

Although there is no bright line that establishes presumptive prejudice under federal law, the Supreme Court has indicated that post-accusation delay is problematic "as it approaches one year."  *Doggett*, 505 U.S. at 652 n.1.  This is a more liberal approach than Mississippi law permits, as has been recognized by the Fifth Circuit, where "[a] delay of ten and one-half months

is not presumptively prejudicial . . . ." *Cowart*, 16 F.3d at 646-47 (citing *United States v. Maizumi*, 526 F.2d 848, 851 (5th Cir. 1976). The *Barker* inquiry is not triggered until the point of presumptive prejudice is reached. The 247 day period between the formal charge and the date that Gray requested a trial delay is less than that which is presumptively prejudicial under federal law. Therefore, Gray is not entitled to a review of his case under the remaining *Barker* factors.

A further review would be unavailing. The remaining factors are the reason for the delay, the assertion of speedy trial rights, and prejudice. The Mississippi Supreme Court found against Gray on each of these factors, and its decision is consonant with established federal law. The reason for the delay in presenting the case to the grand jury was, according to the testimony given in the pretrial hearing, that the FBI took several months to replace its preliminary, partial report with a final version. This is a valid investigatory reason for delay that will not be weighed against the State. *Barker*, 407 U.S. at 531; *United States v. Frye*, 489 F.3d 201, 210 (5th Cir. 2007) (holding that valid reasons, such as tracking down a witness, will not be weighed against the State). Additionally, Gray never properly asserted his right to a speedy trial, filing only a motion to dismiss the indictment. *Cowart*, 16 F.3d at 647. This factor weighs strongly in favor of the State.

Finally, there is the element of actual prejudice. This element protects three interests: (1) preventing oppressive pretrial incarceration; (2) reducing the anxiety of the accused; and (3) protecting against impairment of the defense. From the time of his arrest in August, 1994, Gray was charged with drug possession, illegal firearm possession, and burglary. He could not make bond on any of these charges, which resulted in continuous pretrial custody. "Incarceration on other charges or convictions pending trial also does not constitute prejudice for *Barker*

purposes." *Id.*  Any anxiety that he suffered could have been attributed to any of these charges.

Finally, with regard to prejudice, the events that occurred after March 15 were the death of

Latrelle Page, the guilty pleas on unrelated burglary charges, and his statement to McCall.  Gray

has not established that he was prejudiced by the death of Page.  His contention that Page could

have been "helpful" to his case is the sort of speculative contention that will not support a claim

of actual prejudice.  *Crouch*, 84 F.3d at 1515.  Gray argues that, by pleading guilty to earlier

burglaries, his ability to testify on his own behalf was impacted; however, he has not established

how this event was related to the trial delay.  Finally, Gray apparently argues that he would not

have made the statement to McCall, which likely occurred shortly before he moved for a

continuance, had his trial been held earlier.  Given that he had already made an inculpatory

statement to Saunders, Gray was not substantially prejudiced by his second, voluntary statement

to McCall.

The Mississippi Supreme Court found that Gray's constitutional right to due process and

to a speedy trial were not violated by the delay between his arrest and trial.  That finding is

supported by the record, and the legal conclusion is supported by the applicable federal law.

## H.  GRAY'S CLAIMS OF MENTAL RETARDATION AND ORGANIC BRAIN DYSFUNCTION UNDER *ATKINS V. VIRGINIA*, 536 U.S. 304 (2002).

Prior to trial, Gray's attorneys filed a motion for a psychiatric examination, which was

granted by the trial court.  Gray was examined by Dr. Charlton Stanley, who issued a report on

November 9, 1995, about two months prior to Gray's trial.  At the time that he was examined,

Gray was twenty-three years old.  Relevant portions of that report follow:

Because of the very high risk of malingering with a criminal defendant, no
matter what the charges, a test specially designed to detect malingering was

administered.  He obtained a perfect score on the test, suggesting he was putting forth a good effort, despite the circumstances.  The following test results are judged to be valid representations of his current thinking and behavior.

**On the Wechsler Adult Intelligence Scale**, Rodney Gray was found to have a full scale IQ score of 80 which is classified as low dull normal.  The verbal IQ score of 81 is dull normal, as is the non-verbal (performance) IQ score of 81.  The subtest scatter is relatively even, with no marked digressions from his overall performance.  This means that he has no areas of specific strengths or weakness, and that he is functioning at the dull normal range of intelligence in all areas of ability tested.

. . . .

The **MMPI** was completed, but the validity scales show there were a very large number of novel or unusual test responses.  The **MMPI** appears to be distorted and invalid.  The assessment of the **MMPI** suggests that his intellectual functioning was a bit marginal, and he really may have had some difficulty reading some of the questions.  An IQ of 80 is considered the lowermost point at which a valid **MMPI** can be obtained, and this seems to be what happened here.

. . . .

When we examine the five statistical indicators of brain dysfunction, four of the five fell within the abnormal range, which indicates a fairly high likelihood of brain dysfunction, unless confounding factors such as drugs could account for the scores.

. . . .

My overall assessment of the neuropsychological battery is that there are some abnormal scores, but they can be accounted for by a learning disability which is probably chronic and endogenous.  There is no history of a clinically significant head injury.  Specifically, the neuropsychological tests are consistent with Attention Deficit.

He does not appear to be psychotic, schizophrenic, nor does he suffer from a major thought disorder.  He does appear to have an Attention Deficit Disorder and probably some mild dyslexia.  This would account for some of the difficulty he had with the **MMPI**.  The neuropsychological test result is also of a pattern often associated with some residual artifacts from drug use, although the attention deficit and dyslexia present a similar picture.  There does not appear to be any

53

significant "brain damage" of a type usually referred to as Organic Brain Syndrome.

In other words, he does not appear to have been hit in the head or had other injury which would interfere with thinking and behavior to a significant degree.

He does appear to be competent to assist his attorney in preparing an adequate defense.  He also was examined on the various elements of the *Miranda* Warning, and is able to comprehend and understand the *Miranda* Warning.  He is capable of exercising an act of will, and would be considered competent to make a statement and waive *Miranda* appropriately if he wished.  If he is uncooperative with his lawyers, it will be because he wishes to be oppositional, rather than due to a mental illness, disease or defect.

Dr. Stanley's report was not used as an exhibit at trial.  During the sentencing hearing, five witnesses testified on Gray's behalf: Rosa Lee Gallapsy, his mother's cousin; Louise Bradley, the grandmother of one of Gray's friends; Roosevelt Jones, a minister and business owner who had talked to Gray on many occasions; Hattie Morgan, a neighbor; and Annie Tatum, Gray's mother. The witnesses testified exclusively about Gray's character.

Gray first argued that he was mentally retarded in his petition for post-conviction relief, filed in the Mississippi Supreme Court after the decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the execution of mentally retarded prisoners offended the Eighth Amendment.  Attached to his petition were several affidavits that were offered in support of that contention.  The first was an affidavit from a paralegal for the Mississippi Office of Capital Post-Conviction Counsel, which repeated several observations related by Gray's family members. Another very similar affidavit was signed by an investigator from that office.  Additional affidavits, purporting to shed light on Gray's mental deficiencies were provided by Gray's

mother Annie Tatum,[7] Gray's oldest sister Melissa Jones,[8] Gray's sister Stephanie Wilson,[9] and

---

[7]The Mother's affidavit included the following (the numeration is taken from the affidavit):

9.    Rodney was in special education classes up until the 5th grade.

10.   From the first grade until middle school Rodney seemed to stay in the Principal's office with the secretary. Rodney did not like being in a busy environment and seemed to perform better when he was in a one on one basis.

11.   Rodney had behavioral problems. Mrs. Ola Jones suggested that he should be in a special educational program and had him tested. I believe she is now the Principal at West Jasper Elementary School.

12.   I lost more than one job because I had to constantly go to Rodney's school to help discipline.

13.   Rodney was the only one of my children that did not graduate high school.

14.   I sent Rodney to a psychologist when he was in the 4th or 5th grade. Debbie Parker was the psychologist at Weems Mental Health Center in Meridian, MS, that Rodney talked with.

22.   Rodney did not have very good adaptive skills. When he would wash his clothes, he would wash the whites with the colored clothes instead of separating them.

23.   Rodney could not cook a full meal, but he would cook macaroni and cheese and bologna. He would make sure that he burned them before he would eat it. He would never clean up after making a mess.

27.   I took Rodney to the Bay Springs satellite office of Weems Mental Health Clinic, which is based out of Meridian, MS, when he was in the 3rd or 4th grade because I could not do anything else with him. Rodney had a few counseling sessions then.

28.   Later on, I found out that Rodney used to crawl up into the ceiling where he had a peephole that overlooked my bedroom. He would watch me from there.

30.   Rodney never did keep a job for longer than a week or two. He worked for Choctaw Maids chicken plant for about a half a day. He said that he did not like the job of hanging live chickens.

35.   I truly don't believe that Rodney knew how severe these charges were. I believe he did not understand what was going on. Nor did he realize the consequences of the crime.

40.   One time, Rodney took $50 from me and gave it to my mother. He told her that his father, Robert, gave it to him. Rodney never once thought about how he would convince anyone how he got the money, knowing that I had that same amount missing.

41.   Rodney did not think things through. Once he asked me to buy him this jacket and I told him that I would and for him to meet me at the store at a certain time and I would buy this jacket. Rodney wanted that jacket so he went into the store, put the jacket on, left the store, then hours later, he went back to the same store with the jacket on. I never understood why he went back to the store with the jacket knowing he just took it. I asked Rodney why he did it. He said that he did not know and that he was not thinking about the jacket at that time.

42.   Rodney was sent to Oakley training school for 5 months for this incident. He was 15 years old at the time.

43.   Rodney always had a problem understanding that his actions came with consequences. If he wanted something, he would just get it and be surprised that he would be in trouble later.

(continued...)

55

Ola Jones, the principal of Bay Springs Elementary School.[10]

---

[7](...continued)

44.    During the trial, Rodney would not groom himself.  I believe if he had understood how important this trial was, he would have tried to dress himself better.

[8]Melissa Jones's affidavit included the following (numeration is taken from the affidavit):

8.    Rodney could not cook very well.  He could handle simple things like cooking eggs, but he rarely did it unless he was really hungry.

9.    Rodney never obtained his driver's license.

10.    I had to help Rodney pick out his clothes when we were kids because he was not able to tell what was appropriate to wear at certain times.

15.    Rodney always had behavioral problems at school.  My mother even took him to see a psychiatrist.

16.    The schools referred Rodney for testing to determine if he should be placed into special education classes.

20.    I know that Rodney was seeing a psychologist and I believe that the school he was attending at the time recommended it, but I can't recall when that occurred.  I do believe that someone recommended that he should be put on medication.  I do not believe that he was ever placed on medication.

[9]Wilson testified by affidavit as follows (numeration is taken from the affidavit):

5.    When we were kids, we all had to help take care of Rodney because he had trouble taking care of himself.

6.    Rodney would cook but we had to make sure that he was supervised.  We felt that if we didn't, he would burn down the kitchen.  When he did cook, he would burn the food.

8.    We did not let Rodney do the laundry because he would never separate the colors from the white so he would ruin a lot of clothes.  He never could understand that there were different ways to clean different types of clothes.

11.    Rodney wasn't the type to always get into trouble.  Rodney was the type of person that went to get what he wanted without thinking about the end results.

[10]Ola Jones provided the following by way of affidavit (numeration is taken from the affidavit):

5.    From what I can recall, Rodney was in the special education program at Bay Springs Middle School between the grades of 4th and 8th.  I am not sure at what point he was enrolled in the special education program but it would have been during that time period.

6.    I taught self-contained children.

7.    For one hour a day, my classes would switch between the self-contained students and the students I tutored.

8.    I am not sure what his IQ test scores were.  I know that he had to have had a learning disability or he would not have been placed in the special education program.

(continued...)

56

Attached to Gray's rebuttal brief in support of his post-conviction relief petition was a composite of his school records from first through ninth grade.  These records show that Gray attended Bay Springs Elementary School from the first through the sixth grade.  He was held back once in the third grade, but he completed every other grade and was promoted to the next. From the seventh grade through the ninth grade, Gray attended Bay Springs High School.  His grades in seventh and eighth grade were poor, but he was promoted to the next grade each year. In the 1987-88 school year, Gray apparently failed the ninth grade.  He withdrew from Bay Springs High School in October, 1988, and apparently repeated the ninth grade at the Williams Attendance Center in the 1988-89 school year.  His grades for the first semester of that year were English - 89, General Math - 81, Physical Education - 77, and General Science - 87.  It seems that Gray did not attend school during the second semester of that year.  Gray's records also include standardized test scores from the first through the ninth grade.  No analysis of these scores has been provided, but they seem to show that he was performing at or slightly below grade level each year in reading, but substantially less well in other subjects.

The Mississippi Supreme Court reviewed all of the evidence and held that it did not justify post-conviction relief.  Citing *Atkins v. Virginia*, 536 U.S. 304 (2002), the court noted that the determination of mental retardation has been left to the states.  *Gray*, 887 So. 2d at 168. Mississippi has adopted the definition promulgated by the American Psychiatric Association, which requires:

---

[10](...continued)
11.     I did witness Rodney having tantrums in class and in the hallway.  I am not aware of the circumstances that led to these tantrums.  I do not feel comfortable making a statement about this particular problem without knowing both sides of the story.

> significantly sub-average general intellectual functioning . . . that is accompanied by
>
> significant limitations in adaptive functioning in at least two of the following skill areas:
>
> communication, self-care, home living, social/interpersonal skills, use of community
>
> resources, self-direction, functional academic skills, work, leisure, health, and safety.

*Id*. at 169 (quoting *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000)).  That standard additionally requires that the onset of these difficulties must occur before the age of eighteen.  *Id*.  Finally, the court noted that "'[m]ild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70."  *Gray*, 887 S.2d at 169.  The court also held that Gray had not established an entitlement to a hearing on the issue of mental retardation.  *Id*.  This holding was based on several findings – first, that Dr. Stanley's report that Gray's IQ was 80 "is well above the maximum score for 'mild' mental retardation as defined by the APA."  *Id*.  Additionally, the court noted that none of the school records reflected an IQ score, nor did they show that Gray had been in special education classes.  "The education records reflect a child who at times struggled in school, but they do not offer any proof that Gray's difficulties in school were as a result of mental retardation."  *Id*. at 170.  Moreover, the court did not find that the affidavits offered by Gray's family members or Ms. Jones were persuasive, stating that "none of the affiants, other than Dr. Stanley, possess the requisite qualifications to determine mental retardation, and his nine page report of his evaluation of Gray nowhere contains any mention of mental retardation."  *Id*.

In his § 2254 petition, Gray argues that further investigation is warranted on the issue of whether he is mentally retarded or has organic brain dysfunction.  Respondents argue that the second issue was not raised in the state court and is now barred from review as not having been

exhausted.  In support of his claims, Gray has presented additional evidence that was not made available to the state court.  In particular, he has presented evaluations and reports from the Weems Community Mental Health Center, which treated Gray from 1982 to 1989.

The Fifth Circuit has held that a petitioner may submit evidence for the first time to a federal habeas corpus court without running afoul of the exhaustion requirement, so long as the new evidence merely supplements his claim, rather than fundamentally alters it.  *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005).  If the evidence puts the petitioner's claim in a "significantly different legal posture," however, it must first be presented to the state court. *Anderson v. Johnson*, 338 F.3d 382, 387 (5th Cir. 2003).  The Weems records supplement issues that were raised in state court concerning behavioral factors that supported Gray's claim of mental retardation.  Since they do not fundamentally alter that claim, they will be considered by this Court.

The Weems records show that Gray was seen on several occasions for behavioral problems that primarily related to aggression and theft.  In December, 1982, when Gray was ten years old, his mother brought him to the Center complaining of violent behavior at school.  His medical and developmental history were described by his mother as "normal," with no apparent difficulty in learning to walk or talk.  The social worker's impression of Gray was also that he "appears to be quite a normal young, 10 year old boy.  It may be that he is getting more attention at home in the sense of getting his way about things than is actually good for him."  The tentative diagnosis was "Conduct Disorder, Socialized, Aggressive."  Gray was treated until May, 1983, when his behavior stabilized and he was discharged.  His final diagnosis at discharge was the same.  In March, 1984, Gray returned to the Center with his mother, who reported that he was

stealing from family members.  The therapist described him as "a normal 11 year old boy in

every way.  He is well oriented.  There are not signs of any psychotic activity and he does not

seem to be depressed.  He is a quiet boy, but responsive."  The family did not return after the

initial visit, as the home situation improved.  Gray's diagnosis remained the same.  After Gray

was arrested for shoplifting in 1987, he returned to Weems for treatment.  At that point Gray was

sixteen, and his mental status was described by the social worker, who interviewed him and his

mother, as follows:

> Rodney's face reflects no emotion.  He allows his mother to do most of the
> talking for him and when questioned directly, answers automatically with no trace
> of feeling.  He does not appear depressed.  He gives no indication that he
> understands the gravity of his situation.  Memory is intact.  He is probably
> functioning in a borderline intellectual range.

His diagnosis remained the same.  Gray was scheduled for counseling; however, before he could

be further evaluated, he was arrested, and his file at Weems was closed.

After Gray's § 2254 petition was filed and briefed, he requested funding for examination

by Dr. William O'Brien, to determine whether he is mentally retarded.  The Motion included an

affidavit from Daniel H. Grant, Ed.D., who expressed concern with the testing methods used by

Dr. Stanley in his earlier examination of Gray.  In particular, Grant recommended further testing

to examine possible organic brain dysfunction or neurological impairments.  Gray also attached a

letter from Dr. William D. Owen, a psychiatrist, who strongly recommended additional IQ testing

and expressed his suspicion that Gray is brain damaged.  This Court granted the Motion.

Gray was examined by Dr. Gerald O'Brien, who tested Gray on January 9, 2007.  At that

time, Gray was thirty-four years old.  Dr. O'Brien administered the WAIS-III to evaluate Gray's

IQ, and he scored 89 on Verbal IQ and 90 on Performance IQ, for a Full Scale IQ of 89.

According to Dr. O'Brien, these results place Gray in the low average range of intelligence. Other scores include a 96 on the SHIPLEY and 90 (in word reading) and 87 (in sentence comprehension) on the WRAT4.  These scores were all consistent.  Noting that these scores were somewhat higher than the scores Gray achieved on Dr. Stanley's tests, O'Brien attributed the difference to the "Flynn effect," which recognizes that IQ scores tend to increase over time.  The adjustment suggests that 2.34 points should be deducted from the WAIS-III test for each decade, while 3 points should be deducted from other test scores.    Dr. O'Brien determined that Gray's current "Full Scale IQ is likely to be in the 86-93 range (90% confidence level, based on an obtained score of 89); Flynn-corrected scores would generally follow the same pattern."  Thus, after deducting six points from the 2007 score, Gray's WAIS-III score would drop from 89 to 83 (or an estimated range of 80-87).  Without explanation for deduction, O'Brien stated that Gray's 1995 WAIS-R score would drop from 80 to 74.

With regard to his mental capabilities, Dr. O'Brien concluded that Gray functioned in the low average range.  Based on his interview with Gray, Dr. O'Brien reported that Gray was in special education in the fourth grade, but "tested out."  O'Brien believed that the lower IQ scores in 1995 were likely attributable to the depression and stress associated with the capital murder charges, although he allowed for the possibility that Gray's IQ has improved due to the effects of his incarceration.  However, he stated in his report, "From a psychometric viewpoint current test results rule [sic] tend to rule out mental retardation, but potentially other (legal) arguments could be made, since we are not able to literally go back in time to evaluate him prior to age 18."

Gray's claim must be considered under Atkins, which held that the execution of mentally retarded prisoners was an "excessive sanction" that violates the Eighth Amendment.  536 U.S. at

320-21.  The holding was premised on the Court's conclusion that the functional and behavioral

characteristics of the mentally retarded reduce their culpability for criminal behavior.

Additionally, the Court found that neither of the societal interests that justify the death penalty –

deterrence and retribution – apply to the execution of mentally retarded offenders.  *Id.*  Finally,

the Court reasoned that such offenders are unable, by virtue of their disability, of providing

substantial assistance to their counsel at trial.  *Id.* at 321.  While reaching this conclusion, the

Court left to the States the development of appropriate procedures for determining which

prisoners would be considered mentally retarded.

In response to *Atkins*, the Mississippi Supreme Court announced such a procedure in

*Chase v. State*, 873 So. 2d 1013 (Miss. 2004).  Adopting a more generous test for retardation

than some other states, the court held that the cutoff score for the intellectual functioning element

of the test for retardation is 75.  *Id.* at 1029, n.20 ("[D]efendants with an IQ of 76 or above do not

qualify for Eighth Amendment *Atkins* protection.") *Compare Ex parte Briseno*, 135 S.W.3d 1, 7

(Tex. Crim. App. 2004) (establishing cut-off at 70); *Johnson v. Commonwealth*, 267 Va. 53, 591

S.E. 2d 47, 59 (2004) (same).  The process described in *Chase* contemplates a pre-trial hearing to

determine whether the accused is mentally retarded; however, it also permits defendants to seek

post-conviction relief on this issue.  *Chase*, 873 So.2d at 1029-30.  As a prerequisite to a hearing,

the defendant must file a pleading to which is attached:

> an affidavit from at least one expert, qualified as described above [a licensed
> psychologist or psychiatrist, qualified as an expert in the field of assessing mental
> retardation, and further qualified as an expert in the administration and
> interpretation of tests, and in the evaluation of persons, for purposes of
> determining mental retardation], who opines, to a reasonable degree of certainty,
> that: (1) the defendant has a combined intelligence Quotient ("IQ") of 75 or
> below, and (2) in the opinion of the expert, there is a reasonable basis to believe

62

> that, upon further testing, the defendant will be found to be mentally retarded, as
> defined herein.

*Id*. at 1029.  *Chase* was slightly modified by the later opinion of *Lynch v. State*, 951 So. 2d 549

(Miss. 2007), but only to the extent that the methods of testing for malingering were expanded.

As noted by the Mississippi Supreme Court, Gray did not satisfy the prerequisites

described in *Chase*, which was decided prior to the issuance of the decision denying him post-

conviction relief.  This deficiency was noted in the opinion:

> Gray's reply was filed December 31, 2003, and no further reply or
> supplementation was filed subsequent to this Court's definitive opinion, published
> on May 20, 2004, regarding the standards and procedures to be followed in order
> to obtain an evidentiary hearing in the trial court on the issue of mental
> retardation.

887 So. 2d at 169, n.1.  The procedure announced in *Chase* is a valid exercise of the authority left

to the States by *Atkins* to define mental retardation.  Because Gray failed to satisfy the elements

of that procedure, the Mississippi Supreme Court was justified in denying his claim.  There being

no clearly established federal precedent indicating that the *Chase* procedure is constitutionally –

or otherwise  – infirm, this decision cannot be contrary to or an unreasonable application of

federal law.

Even with the more recent material submitted to this Court, Gray cannot establish that he

is mentally retarded within the ambit of *Atkins* or *Chase*.  Neither of the two qualified experts

who has examined him has declared Gray to have an IQ sufficiently low to meet the criteria for

retardation.  In fact, Dr. O'Brien has specifically declared that he does not meet those criteria.

The school records, affidavits from family members, and psychological records, while

demonstrating that Gray has some behavioral difficulties, do not conflict with the experts'

assessments to any significant degree.  The only basis on which Gray could possibly mount a

claim of retardation was in Dr. O'Brien's assessment of the 1995 WAIS-R test, which, when

corrected for the Flynn effect, he estimated would drop from 80 to 74.  It is not clear why

O'Brien deducted six points from a test score that Gray achieved near the time of the murder, but

accepting this score would put Gray barely within the criteria for borderline mental retardation,

as defined by the Mississippi Supreme Court.  *Thorson v. State*, No. 2004-DR-02248-SCT, 2007

WL 2446474 at *6 (Miss. Aug. 30, 2007).  This Court does not accept this score as an actual test

result, in which an expert has opined to a reasonable degree of certainty a particular IQ.  Instead,

it is only an application of another theory to arrive at an estimate of an earlier IQ.  *See, e.g., Berry*

*v. Epps*, No. 1:04cv328DD, 2006 WL 2865064 at *35 (N.D. Miss. 2006) (refusing to adopt test

scores modified by "Flynn effect").  Moreover, Dr. O'Brien stated later in his opinion, "In

summary, this individual is currently functioning in the low average range intellectually, even

allowing for lower Flynn-corrected test scores from 1995, and second-hand reports of past school

performances."  Thus, there is no evidence, in the form required by Mississippi law, to support

Gray's claim that he is mentally retarded.

Gray argues that the Court should also consider the possibility of organic brain damage as

lessening his culpability and making the death penalty an inappropriate punishment for him.  As

noted by Respondents, this particular issue was not raised to the state court.  The law requires

Gray to present to the state court the " controlling legal principles" that he believes apply to

the facts of his case or risk default.  *Picard v. Connor*, 404 U.S. 270, 277 (1971).  It is

unnecessary to consider whether this "claim" is barred, since, in any event, organic brain damage,

unless accompanied by mental retardation, will not bring a prisoner within the protection of

*Atkins*.  *Berry v. State*, 882 So. 2d 157, 174 (Miss. 2004).

For all of these reasons, this Court is compelled to conclude that the state court opinion

recognized the applicable law, reasonably applied it to the facts of Gray's case, and cannot be

disturbed on habeas corpus review.  Moreover, there is no new evidence tending to support

Gray's claim that he is now mentally retarded.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

## The Unexhausted Claims

Gray asserts thirty-four independent claims of ineffective assistance of counsel.

Respondents contend that of those claims, seventeen are unexhausted[11] and two are merely

---

[11]The unexhausted claims are (numeration taken from §2254 petition):

6.    Failing to properly investigate the circumstances leading to the purported identification of Gray by Harris Jones through the use of an impermissibly suggestive and unreliable photo line up and one-on-one jail cell show up.

7.    Failing to timely object to the identification of Gray by Harris Jones which was made by virtue of an impermissibly suggestive line and unreliable photo lineup and one-on-one jail cell show up.

8.    Failing to request a pre-trial suppression hearing on the impermissibly suggestive and unreliable identification of Gray by Harris Jones.

9.    Failing to object to the trial court's refusal to grant a motion to strike the prosecution's improper comments during the sentencing phase that they should be fair to the victim's family and the victim's grandchild was cheated out of her, and then to request a corrective instruction or mistrial.

10.   Failing to request a curative instruction or mistrial when the prosecutor made improper comments during the guilt phase of the trial that the judge knew Gray was guilty.

11.   Failing to object at trial that the jury instructions allowed the jury to impose the death sentence without finding that he intended to kill his victim

12.   Failing to object that the form of verdict was defective for failing to include a written confirmation that the jury found the required aggravating factors beyond a reasonable doubt.

13.   Failure to object to the introduction of state expert Smrz's testimony pertaining to DNA evidence when the expert had not performed the tests or been present when they were performed.

(continued...)

"general arguments."[12]  Gray does not dispute or contest the characterization of any of these

twenty-one claims.

A § 2254 claim that was not raised in state court has not been properly exhausted.

Applicants seeking federal habeas corpus relief under § 2254 are required to exhaust all claims

_____

[11](...continued)
14.  Failure to properly prepare a rebuttal to DNA evidence
17.  Failing to offer affidavits of experts opining that Gray was mildly mentally retarded or low dull normal intelligence during the sentencing trial.
18.  Failure to request a continuance during trial to better equip themselves to cross-examine the DNA expert after admitting to the court that they lacked the knowledge to competently cross examine the prosecution's expert.
19.  Failure to contact a potential alibi witness prior to that witness's death.
20.  Failure to object to the unreasonable delay of Gray's indictment and appointment of counsel on his capital murder charge, which resulted in an impermissibly suggestive identification of Gray, jailhouse confessions to inmate snitches, and the loss of a potential witness.
22.  Failing to preserve, at trial, appeal, or post-conviction proceedings, any claims presented in this Petition.
27.  Failing to object to at trial and appeal the prosecution's introduction of a video tape depicting the victim's body.
30.  Failure to object at trial to instruction S-6 on grounds that it excluded considerations of sympathy.
31.  Failure to object at trial to instruction S-3 when it was read to the jury after it had not been considered by the court or attorneys during instruction conference.
32.  Failure to object to instruction S-4 when it was submitted, which did not include essential circumstantial evidence language.
33.  Failure to request a mercy instruction during the sentencing trial.

[12]Gray's arguments not amounting to actual claims are (numeration taken from §2255 petition):
21.  Petitioner affirmatively pleads cause and prejudice for the non-exhaustion of the failure to investigate and present mitigation claims plead above, and any and all other ineffective assistance claims made in the Petition.
34.  For these reasons, the Mississippi Supreme Court's denial of Gray's ineffectiveness claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court in *Strickland*; and separately, resulted in a decision that was based on an unreasonable determination of the facts in the light of the evidence presented in the State court proceeding, and thus the writ should issue pursuant to 28 U.S.C. §2254(d)(1) and (d)(2).

in state court prior to requesting federal collateral relief.  *See Edwards*, 529 U.S. at 451; *Coleman*, 501 U.S. at 729-55; *Whitehead*, 157 F.3d at 387.  The exhaustion requirement is satisfied when the substance of the federal habeas corpus claim has been fairly presented to the highest state court in a manner that adequately developed the factual basis for the claim. *Williams v. Taylor*, 529 U.S. at 429-30.  That presentation must also alert the state court to the legal basis for the claim.  *Baldwin*, 541 U.S. at 29.

In response, Gray has offered several reasons for his failure to exhaust the ineffective assistance of counsel claims.  First, he contends that he should not be required to exhaust a claim in state court if such an attempt would be futile.  Where a petitioner has failed to exhaust all of the claims in his federal habeas corpus petition, the federal court generally must dismiss it, so that the petitioner can return to the state court to exhaust those claims.  *Rose v. Lundy*, 455 U.S. 509, 522 (1982).  Under the "futility exception" to the exhaustion requirement, if state procedural rules bar the petitioner from seeking further relief on his unexhausted claims in state court, the exhaustion requirement is satisfied.  *Coleman*, 501 U.S. at 750.  That exception is codified at 28 U.S.C. § 2254(b)(1)(B), excusing failure to exhaust when it appears that:

(I)     there is an absence of available State corrective process; or

(ii)    circumstances exist that render such process ineffective to protect the
        rights of the applicant.

However, when the futility exception applies because the petitioner allowed his state law remedies to lapse without presenting his claims in state court, the claim is considered to be procedurally defaulted.  *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998).

With respect to counsel's failure to challenge the eyewitness identification testimony

Gray asserts that he should be excused from exhausting because the Mississippi Supreme Court

had recently decided a case adversely to his position, thereby making it futile to have raised this

claim in state court.  He cites *Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir. 1999), for that

proposition.  In *Fisher*, the court held that the futility exception applied where "the highest state

court has recently decided the same legal question adversely to the petitioner."  *Id*.  In taking this

position, the Fifth Circuit joined a minority of the Circuits in recognizing this situation as

excusing failure to exhaust.  Several other Circuits disagree. *Price v. Simmons*, 196 F. App'x

696, 697 (10th Cir. 2006); *Parker v. Kelchner*, 429 F.3d 56, 63 (3d Cir. 2005); *Jones v. Keane*,

329 F.3d 290, 295 (2d Cir. 2003); *Minter v. Beck*, 230 F.3d 663, 666 (4th Cir. 2000); *Scott v.

Mitchell*, 209 F.3d 854, 872 (6th Cir. 2000);  *Waldrup v. Jones*, 77 F.3d 1308, 1315 (11th Cir.

1996); *White v. Peters*, 990 F.2d 338, 342 (7th Cir.); *Roberts v. Arave*, 847 F.2d 528, 529 (9th

Cir. 1988).  The court in *Fisher* applied this principle to a case involving a question of law, in the

sense that it involved the application of a specific law to similarly situated litigants.  There, the

question was whether religion-based peremptory strikes violated the Equal Protection Clause.

*Fisher*, 169 F.3d at 303.  Application of the futility doctrine to cases involving legal claims

makes it easier to satisfy the requirement that the adverse decision on which a petitioner relies

must have been rendered after "a full and fair opportunity to decide the *same* issue in a *recent*

case . . . ."  *Lewis v. Cockrell*, 2003 WL 261847 at *4 (5th Cir. 2003) (ex post facto claim);

*Fisher*, 169 F.3d at 303; *Youngblood v. Lynaugh*, 882 F.2d 956, 960 (5th Cir. 1989), *rev'd on

other grounds sub nom, Collins v. Youngblood*, 497 U.S. 37 (1990) (ex post facto claim); *Layton

v. Carson*, 479 F.2d 1275, 1276 (5th Cir. 1973) (substitution of imprisonment for fines for

indigent prisoners).  In contrast, the Fifth Circuit has rejected the futility argument for a fact-based claim.  *Beazley v. Johnson*, 242 F.3d 248, 269 (5th Cir. 2001).  There, the petitioner had failed to exhaust his claim that a Texas county had engaged in a longstanding pattern of discrimination in the selection of grand jury forepersons.  When he attempted to argue that the claim had been exhausted by its rejection in state court in other cases, the Fifth Circuit characterized his argument as a "vicarious exhaustion proposition."  *Id*.  In *Bruce v. Cockrell*, 74 F. App'x 326, 337 (5th Cir. 2003), the court rejected a claim that futility excused the failure to exhaust a claim that instructions given at trial did not permit the jury to give full effect to the evidence of mitigating circumstances.

Here, Gray claims that his trial counsel failed to object to identification testimony that was impermissibly tainted by a pretrial viewing at the jail.  This is clearly a fact-based inquiry, and the admissibility of the testimony was evaluated under the test set out in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).  Those factors can only be measured with reference to the specific facts of  the case.  The Mississippi Supreme Court decision cited by Gray in support of his futility claim is *Thompson v. State*, 483 So. 2d 690 (1986), where the appellant challenged an eyewitness's in-court identification of him, on grounds that it was tainted by the victim's earlier observation of the appellant in jail.  The victim was found to be a frequent visitor at the jail, who was often allowed to go into the cell block area.  *Id*. at 691.  On the day that he saw the appellant, the victim went to the jail on his own accord, not having been summoned by any member of law enforcement.  He did not inform the radio operator, who permitted him to enter the cell block area, why he was there.  It was not even clear that the radio operator was aware of the identity of the appellant's victim.  For these reasons, the state court found no state action caused the

viewing, which was, instead, "the independent act of a private individual." *Id*.  The court held

that this viewing did not trigger any Sixth Amendment right to counsel, but it went on to consider

that factor in determining whether the viewing tainted the identification.  Reviewing cases from

other jurisdictions that rejected this argument in cases where the viewing was accidental, or not

arranged by authorities, in conjunction with its analysis of the *Neil* factors listed above, the court

held that the victim's later identifications of the appellant were not tainted.  This is a very

different situation than that presented in Gray's case.   To hold that *Thompson* excused Gray

from exhausting his claim would entitle every petitioner who has defaulted a claim to look for

remotely similar cases from the state court that were decided in favor of the State, and belatedly

claim that those decisions excused him from subjecting his case to state review.   To do so would

defeat the principles of comity, finality and federalism that are the AEDPA's purpose. *Duncan v.

Walker*, 533 U.S. 167, 178 (2001).  Therefore, Gray's argument that he has exhausted this claim

should be rejected.

Gray also maintains that deficiencies in Mississippi's Office of Post-Conviction Counsel

should excuse him from exhausting all of his issues in state court.  Gray argues that the State of

Mississippi, through its opinion in *Jackson v. State*, 732 So. 2d 187 (Miss. 1999), established a

right to post-conviction representation for inmates sentenced to death.  That right is particularly

important in Gray's case, he contends, because his trial and appellate counsel were the same.

Thus, the first time that ineffectiveness issues could be raised was during the post-conviction

process, which, for that purpose, functioned as a direct appeal.  By providing post-conviction

counsel who were too overworked to give his case adequate consideration, the State denied him a

procedure for adequate and effective appellate review.

The law on this issues is well settled.  There is no constitutional right to counsel beyond the direct appeal.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.").  That rule applies equally to death penalty cases.  *Murray v. Giarratano*, 492 U.S. 1, 10 (1989).  Since there is no constitutional right to counsel in post-conviction proceedings, there is generally no concomitant right that post-conviction counsel be effective, *Coleman*, 501 U. S. at 755-56; *Ruiz v. Quarterman*, 504 F.3d 523, 531 (5th Cir. 2007); *Sheffield v. State*, 881 So. 2d 249, 255 (Miss. Ct. App. 2004), even if the claims that were defaulted were necessarily raised for the first time during the post-conviction process. .*Martinez v. Johnson*, 255 F.3d 229, 241 (5th Cir. 2001); *see also Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003); *Bishop v. Epps*, 265 Fed. Appx. 285 (5th Cir. 2008); *see also Matchett v. Dretke*, 380 F.3d 844, 849 (5th Cir. 2004) (reaching the same result when a claim is brought as a due process violation); *Ogan v. Cockrell*, 297 F.3d 349, 357 (5th Cir. 2002).

In *Ruiz v. Quarterman*, 460 F.3d 638, 644 (5th Cir. 2006), the petitioner argued that the state had obstructed his efforts to earlier exhaust his claims by providing him incompetent counsel, "effectively making his state remedy illusory . . . ."  *Id*.  The court denied relief, holding:

[T]he law of this Court is clear, ineffective state habeas corpus counsel does not excuse failure to raise claims in state habeas corpus proceedings.  Where the state has provided a habeas corpus remedy, the petitioner must pursue it before filing in federal court, even if the state provides ineffective habeas counsel.

*Id.*[13]  Gray's failure to exhaust is not excused, and he is procedurally barred from raising any ineffectiveness claim that was not addressed in his post-conviction pleadings.

Alternatively, Gray's defaulted claims fall generally into eleven categories:

(1) Harry Jones's identification of Gray (Nos. 6-8);

(2) prosecutors' comments (Nos. 9-10);

(3) sentencing instruction - intent (No. 11);

(4) whether aggravating circumstances were found beyond a reasonable doubt (No. 12);

(5) Melissa Smrz's testimony (Nos. 13-14 & 18);

(6) mental retardation (No. 17);

(7) failure to contact alibi witness (No. 19);

(8) failure to object to pre-indictment delay (No. 20);

(9) failure to preserve general claims (No. 22);

(10) failure to object to video (No. 27); and

(11) claims related to other instructions.

The underlying claims – specifically, categories 1 (eyewitness identification), 2 (prosecutors' comments), 4 (form of the verdict), 5 (DNA testimony), 6 (mental retardation) and 9 (pre- and post-indictment delay) –  are addressed elsewhere in this Opinion and have been found to be without merit.  The standard for ineffectiveness claims is provided by the familiar case of *Strickland v. Washington*, 466 U.S. 668 (1984), and requires a showing of defective performance

---

[13]Later, the Fifth Circuit granted relief based on Fed. R. Civ. P. 60(b).  Relief was not granted on grounds that the prior opinion was in error; in fact, the court referred to its earlier opinion on the issue of ineffectiveness of post-conviction counsel.  Instead, the court granted relief on grounds that, after the first opinion was issued, the state court ruled on the merits, thereby eliminating the issue of exhaustion.  *Ruiz*, 504 F.3d at 531.

and prejudice.  As stated earlier, prejudice cannot result from counsel's failure to assert a

meritless claim or make a meritless argument.  *See Parr*, 472 F.3d at 256.  Thus, even if these

claims had not been defaulted, Gray has failed to establish ineffective assistance under the

*Strickland* standard.

Gray has presented argument for some of his defaulted claims.  First, he contends that his

counsel failed to ask for a continuance to prepare to cross-examine Melissa Smrz.  Gray bases his

argument on Smrz's testimony on one statement made by his attorney prior to cross-examination,

where he admitted to feeling "very inadequate to examine this witness due to the fact that I have

little or no understanding of DNA."  The record shows that the defense was provided with an

expert Dr. Scales to assist in interpreting the DNA evidence.  Dr. Scales was present during

Smrz's testimony, and counsel conferred with him during the break that occurred between direct

and cross-examination.  The comment on which Gray relies occurred in connection with a

request that Dr. Scales be permitted to ask questions of Smrz.  Although the trial judge would not

permit Dr. Scales to question Smrz, he did inform counsel that he would "give you ample

opportunity to confer with him."

Next, Gray raises counsel's failure to contact Latrelle Page as a potential alibi witness.

As is explained more fully elsewhere, Gray has never established that Latrelle Page could have

given testimony that would have exonerated him in Blackwell's death.  Therefore, he has not

shown that counsel's failure to interview him in the two months between their appointment and

his death prejudiced Gray.  Even if they had interviewed him, it would not have been likely that

his testimony would have been preserved for use at trial.  No claim of ineffectiveness can be

based on this argument.

Finally, Gray raises counsel's failure to object to Instruction S-6. Instruction S-6 was given at the sentencing phase of his trial. Gray characterizes S-6 as a "no-sympathy" instruction, prohibited by state law. In support of his argument he cites *King v. State*, 784 So. 2d 884, 898-99 (Miss. 2001). Gray's reliance on *King* is misplaced. In *King*, the Mississippi Supreme Court reaffirmed its approval of exactly the language used in S-6. *King* stands for the proposition that the trial court must not permit "any undue emphasis of the anti-sympathy admonition so as not to fetter unduly reasoned consideration of factors offered as mitigating." *Id*. at 899. Thus, in *King*, where the jury was instructed that it "must not consider sympathy," where counsel was prohibited from asking for sympathy in any way in his closing argument, and where the jury was re-instructed after closing that sympathy had no part in its deliberations, reversible error occurred. That is clearly inapposite to Gray's contention. In addition, clearly established federal law does not demand that a jury be instructed to consider sympathy toward the defendant. *Saffle v. Parks*, 494 U.S. 484, 494-95 (1990); *see also California v. Brown*, 479 U.S. 538, 542 (1987) (holding that it is not error under federal law to instruct the jury not to base its sentencing recommendation on sympathy).

Defaulted or not, the record does not support Gray's contention that trial counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

With regard to the remaining defaulted claims, Gray has failed to offer any argument regarding:

(1) Failure to object that jury instructions did not require a finding of intent (No. 11);

(2)  Failure to object to introduction of the videotape made during the recovery of Blackwell's

body (No. 27);

(3)  Failure to object to instruction S-3 (No. 31);

(4)  Failure to object to instruction S-4 (No. 32); and

(5)  Failure to request a mercy instruction (No. 33).

Issues that are not adequately briefed, with citations to authorities, are deemed waived.  *Curry v.*

*Strain*, 262 F. App'x 650, 652 (5th Cir. 2008).  Thus, these claims are not only unexhausted, but

abandoned.

**The Exhausted Claims**

Gray's exhausted ineffective assistance of counsel claims are:

1.    Failing to properly investigate the circumstances leading to the alleged
      jailhouse confessions made by Gray to two inmate snitches.

2.    Failing to object at trial to the testimony of two inmate snitches as to
      Gray's alleged jailhouse confessions.

3.    Failing to request an instruction requiring the jury to weigh a snitch's
      testimony with caution and suspicion.

4.    Failing to produce any authority to support their position regarding
      jailhouse confessions on appeal.

5.    Failing to request a suppression hearing to oppose the introduction of the
      testimony of two inmate snitches as to petitioner's alleged jailhouse
      confessions and to determine what inducements and offers of leniency they
      received in return for their testimony.

15.   Failing to investigate and present mitigation evidence at the sentencing
      phase, including: (a) evidence of the poverty of Gray's family during his
      childhood; (b) evidence of the lack of support for Gray in his childhood,
      leading to low grades and other problems; (c) evidence of the
      psychological factors and condition suffered by Gray at the time of the
      alleged offense; (d) evidence of Gray's dull normal intelligence, and (e)

75

adequate character testimony when family members, friends and neighbors were available to do so, when witnesses were available and willing to offer helpful testimony.

16.     Failing to request their own court-appointed psychiatrist to offer mitigating evidence at sentencing.

23.     Failing to properly locate and present witnesses in support of a motion for change of venue.

24.     Failure to present sufficient affidavits in support of a motion for change of venue.

25.     Failure to argue that the presumption in favor of change of venue was irrebuttable because there was inordinate media coverage and the crime was committed by a black defendant upon a white victim, and was a crime against an influential family.

26.     Failure to object to the jury panel based on the prejudicial effect of pre-trial publicity.

28.     Failure to object to the trial court's excusing of black jurors for cause where there were an insufficient number of black members on the panel in relation to the percentage of blacks in Newton County.

29.     Failure to file a motion to quash the indictment on grounds that it did not contain the essential elements of the crime charged.

Claims one through five relate to Gray's assertion that the trial court improperly permitted Russell Saunders and Cleveland McCall to testify regarding the inculpatory jailhouse statements.  The Mississippi Supreme Court did specifically address this ineffective assistance of counsel claim in its post-conviction opinion.  The Mississippi Supreme Court did, however, find that the underlying claims were both procedurally barred and without merit on direct appeal. *Gray*, 887 So. 2d at 167.  Finding that no new evidence had been presented since that time, the court held that "the doctrine of res judicata applies and bars reconsideration."  *Id*.  This Court addressed the issue of the jailhouse confessions in another section of this Opinion.  The Court

has concluded that the testimony was properly admitted.  Thus, counsel cannot be faulted for

failing to prevent this admissible evidence from coming before the jury.

Claims Nos. 15 and 16 relate to Gray's contention that the mitigation case presented on

his behalf at trial was so inadequate as to have amounted to ineffectiveness.  Gray has argued this

issue more extensively than any other ineffectiveness claim.  In reviewing this and the other

claims of ineffectiveness on post-conviction, the Mississippi Supreme Court relied on the two-

part test announced in *Strickland* of deficient performance and prejudice.  *Gray*, 887 So. 2d at

164.  A finding of prejudice requires a determination that "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id*.  The state court framed Gray's claim on the presentation of mitigation evidence in terms of

this test.  *Id*. at 167.  Its analysis also seemed to focus on the issue of whether additional evidence

would have had any "persuasive effect" on the jury.  *Id*. at 168.  This language suggests that the

court either presumed deficient performance or failed to reach that issue, concentrating instead on

prejudice.  *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002).  Considering  the evidence that had

been presented in mitigation, that court reached the following conclusion:

> [T]his Court has previously held that so long as trial counsel presents to the
> sentencing jury evidence of a capital defendant's educational background,
> psychological profile and childhood experience, there is no professional error
> under the *Strickland* standard.  *Brown v. State*, 798 So. 2d 481, 498-99 (Miss.
> 2001).  In the present case, Gray's defense attorneys did, in fact, present a case in
> mitigation for the jury to consider.

*Gray*, 887 So. 2d at 167.  The failure to offer testimony or evidence from Dr. Stanley was

considered, but the court held that his conclusion that Gray was "dull normal," rather than

mentally retarded, "would have had little if any persuasive effect on the jury in mitigation.  *Id*. at

77

167-68.  Characterizing its decision on this issue as a "close call," the court held that Gray's trial

counsel were not ineffective in presenting a mitigation case.  *Id*. at 168.

In support of his claims, Gray relies on the standard for investigation of mitigation

evidence in *Williams v. Taylor*, 529 U.S. 362 (2000) and *Wiggins v. Smith*, 539 U.S. 510 (2003).

In *Williams*, defense counsel failed to investigate the defendant's childhood, on the mistaken

grounds that he could only do so by obtaining records that he thought were barred from access by

state law.  By failing to investigate, counsel neither obtained nor presented evidence showing that

the defendant's childhood was "filled with abuse and privation" and that he was borderline

mentally retarded.  529 U. S. at 398.  Finding that this evidence could reasonably have affected

the jury's decision to impose the death penalty, the Court reversed and remanded the case.

In *Wiggins*, although counsel told the jury at the beginning of the mitigation phase that

they would hear evidence on Wiggins's difficult life, they instead focused on their claim that

Wiggins's life should be spared because he was not directly responsible for the murder.  In so

doing, the attorneys failed to present to the jury the following evidence, given at a post-

conviction hearing by a licensed social worker:

> According to Selvog's report, petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. [References to the record are omitted throughout.]  Mrs. Wiggins's abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner-an incident that led to petitioner's hospitalization.  At the age of six, the State placed Wiggins in foster care.  Petitioner's first and second foster mothers abused him physically, and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him.  At age 16, petitioner ran away from his foster home and began living on the streets.  He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one

78

occasion.  After leaving the foster care system, Wiggins entered a Job Corps
program and was allegedly sexually abused by his supervisor.

*Wiggins,* 539 U.S. at 516-17.  Given the strength of the evidence omitted, the Court found that

the failure to present it to the jury could not be defended as a strategic decision, but was simply

deficient performance.  *Id.* at 535.  The Court further found that the failure to present the

evidence prejudiced Wiggins, stating, "Had the jury been able to place petitioner's excruciating

life history on the mitigating side of the scale, there is a reasonable probability that at least one

juror would have struck a different balance."  *Id.* at 537.

In *Rompilla v. Beard*, 545 U. S. 374 (2005), the Court held that trial counsel was

ineffective for failing to review his client's prior conviction file.  The Court reached this

conclusion despite finding that defense counsel interviewed the defendant extensively before

trial, spoke with family members, and asked mental health experts to review Rompilla's mental

state at the time of the offense.  Counsel's investigation turned up nothing useful.  *Id.* at 381-82.

In contrast, the prior conviction file, which was obviously available to the State, contained an

evaluation by a corrections officer who related a troubled childhood and alcohol abuse, as well as

test results indicating schizophrenia.  *Id.* at 391-92.  The Court found that failure to review the

file was deficient performance, and the omission of this evidence, as well as other evidence to

which the file referred, was prejudicial.

Gray's trial counsel presented evidence from neighbors and friends who testified that

Gray was a respectful, polite, non-violent, calm, normal young man.  Gray's mother testified  that

he was a normal, good boy, but he began having problems after she and his father separated.  At

that point, he began seeking attention at school by disturbing the class, and he spent a lot of time

in the principal's office.  She said that he had a good temperament.  The other information

available to counsel at that point was Dr. Stanley's report, which concluded that Gray was not

mentally retarded, but possibly had a learning disability, perhaps Attention Deficit Disorder or

dyslexia.  In addition to this information, however, Stanley reported that Gray was markedly

antisocial, that he thought about sex too much, and that, sexually, he preferred older women.  Dr.

Stanley characterized Gray as childlike and impulsive, passive-aggressive (but capable of being

as violent as anyone else), with an undeveloped or underdeveloped conscience.  He further

thought that Gray needed the structure of a maximum security prison setting.  Finally, Dr. Stanley

stated, "There does not appear to be any significant 'brain damage' of a type usually referred to

as Organic Brain Syndrome."

As reiterated by the Supreme Court in *Woodford*, habeas corpus review of a state court's

determination of a *Strickland* claim is limited to a determination of whether that determination is

"objectively unreasonable."  537 U.S. at 27.  "[I]t is not enough to convince a federal habeas

court that, in its independent judgment, the state-court decision applied *Strikland* incorrectly."

*Id*. (citing *Bell*, 535 U.S. at 699).  The Mississippi Supreme Court applied the *Strickland* standard

to Dr. Stanley's report and determined that it would not have been helpful to Gray to have

presented his testimony to the jury.  Based upon the record, this Court cannot conclude that this

determination is objectively unreasonable.

The state court also reviewed the new affidavits from Gray's family members and Ms.

Jones.  As noted earlier, they include information indicating that Gray had difficulty with

ordinary household tasks, such as laundry and cooking.  They also include substantial

unfavorable information about Gray's behavioral problems, including his mother's statement that

he would crawl into their ceiling and watch her, as well as his history of aggressive behavior and theft.  The Mississippi Supreme Court did not specifically conclude that this information would not have been helpful; the opinion said only that the mitigation case that was presented was adequate.  *Gray*, 887 So. 2d at 167.  This Court's analysis, therefore, "is not circumscribed by a state court conclusion," and its review is de novo.  *Wiggins*, 539 U.S. at 534.  Where additional mitigation evidence is presented on habeas corpus review, the reviewing court should analyze both its favorable and unfavorable potential to the petitioner.  *Smith v. Quarterman*, 515 F.3d 392, 404 (5th Cir. 2008).  Thus, a claim of good behavior in prison can have the downside of reminding the jury that the prisoner is incapable of conforming his conduct outside an institutional setting.  *Id*.  Gray has offered an affidavit from the Sheriff of Newton County stating that his behavior while incarcerated there was good.  However, news articles attached to the habeas corpus pleadings, as well as a brief statement made by Sheriff Hanna during his testimony, indicate that Gray escaped from that facility on one occasion.  This could have had a chilling effect on a jury being asked to consider life in prison as the appropriate punishment.  Similarly, a claim of organic brain damage could cause the jury to conclude that the prisoner will represent a continuing problem to society.  *Id*. at 405.  Finally, where the aggravating factors are "overwhelming," the reviewing court may find that "there was no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, warranted the capital punishment sentence that was imposed."  *Sonnier v. Quarterman*, 476 F.3d 349, 363 (5th Cir. 2007).

Having reviewed the additional mitigation evidence offered by Gray, this Court cannot conclude that it would have changed the outcome of this case.  The testimony at trial established

that Blackwell was under Gray's control for a period of hours, during which she must have feared

for her life.  Her injuries were, by any standard, horrific.  By comparison, the circumstances of

Gray's life fall well short of the facts and circumstances outlined in *Wiggins* and *Williams*.  For

all of these reasons, this Court concludes that Gray has failed to show that he was prejudiced by

his attorneys' failure to present this additional evidence to the jury.

Gray's next claim of ineffective assistance relates to his attorneys' preparation for and

handling of the motion for change of venue that was filed prior to trial.  Gray has directed the

Court to a series of articles written in local newspapers.  Although the dates of all of the articles

are not included, they appear to have been published from August, 1994, shortly after the crime

was committed, to August, 1995, when Gray apparently escaped from jail.  Gray's trial took

place in January, 1996.  In addition to the pretrial publicity, Gray argues that, given his race

(black) and that of the victim (white), as well as the victim's "relationship" to a Congressman

(Agent Smrz testified that Blackwell's daughter worked in the office of Congressman Gene

Taylor), there was an irrebuttable presumption that venue should be changed, citing *Evans v.*

*State*, 725 So. 2d 613, 647 (Miss. 1997).  Gray further maintains that his lawyers' failure to

mount a sufficient effort to have the trial moved from Newton County prejudiced him, as is

shown by the short time that the jury deliberated on the guilt and sentencing verdicts.

The Mississippi Supreme Court addressed Gray's underlying claim in its opinion on his

direct appeal.  *Gray*, 728 So. 2d at 65-66.  Reviewing the pretrial hearing on Gray's motion to

change venue, the court found that the affidavits submitted by his counsel were deficient and

rebutted by the witnesses who testified on behalf of the State.  Additionally, the court found that

no irrebuttable presumption had been established that venue should have been changed and that a

fair and impartial jury had been seated.  *Id*. at 66-67.  Gray raised this claim during post-conviction, arguing that his attorneys were ineffective in the manner in which they argued the change of venue motion.  The court rejected that argument, characterizing it as an attempt to re-litigate the underlying claim through a post-conviction petition, in the guise of an ineffectiveness claim.  *Gray*, 887 So. 2d at 164.  Noting that Gray had failed to present any new or additional evidence in support of his claim, the court denied it.

Gray's assessment of the Mississippi Supreme Court's opinion in *Evans* is accurate – the court there said that in a capital case, where there is an inordinate amount of pretrial publicity, and where a black defendant is charged with committing a serious crime against a white victim from a prominent family, an irrebuttable presumption may be created such that venue should be changed.  However, to determine whether the trial judge abused his discretion in not ordering a change of venue, the court "will look to the completed trial including the voir dire examination of the jurors to ascertain if the defendants have received a fair and impartial trial."  *Evans,* 725 S.2d at 647 (quoting *Billiot v. State*, 454 So. 2d 445, 455 (Miss. 1984)).  The *Evans* court recognized that the presumption of prejudice "may be rebutted by the State's demonstration that an impartial jury was actually impaneled."  *Evans*, 725 So. 2d at 648.  After considering that only three of the jurors who were ultimately impaneled indicated that they had read pretrial publicity, and that each of them said that they could set that information aside and decide the case solely on the evidence admitted at trial, the court held that an impartial jury was actually impaneled; therefore, there was no error in failing to change the venue of the trial.

The Mississippi Supreme Court first found that Gray had not presented sufficient evidence that the presumption that venue should be changed had become irrebuttable in his case.

83

"Although this was a capital murder case and the Defendant was a black man accused of killing a white woman, there was no intensely prejudicial pretrial publicity so as to create a presumption of prejudice among potential jurors . . . ." 728 So. 2d at 66.  The court then reviewed the voir dire questioning of the venire and concluded that it was adequate and failed to demonstrate that any pretrial information had caused those jurors to be prejudiced.  The court also mentioned Gray's failure to object to the jury on those grounds.  Finding nothing in the record to indicate that the jury was prejudiced, the court held that this claim was without merit.  Gray has not shown that this decision was contrary to or an unreasonable application of federal law.

Under federal law, pretrial publicity, even if extensive, does not, in itself, deprive a defendant of a fair trial.  *Murphy v. Florida*, 421 U.S. 794, 799 (1975).  Instead, where the effects of such publicity are offered as an indication that a jury was not impartial, the Court must examine "any indications in the totality of the circumstances that [his] trial was not fundamentally fair."  *Id*.  The fact that the jury may be knowledgeable about the case prior to their arrival at the courthouse is not such an indication.  *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961).  ("It is not required . . . that the jurors be totally ignorant of the facts and issues involved.")  In Gray's case, as the Mississippi Supreme Court recognized, his contention that he was prejudiced by pretrial publicity in this matter can be resolved by an examination of the voir dire record.  During the preliminary question, the trial judge asked the following question:

> BY THE COURT: How many of you knew there was such a case before I announced it this morning?  Would you raise your hands, please?  Now, to those of you who have indicated you knew there was such a case, did you learn of it by word of mouth or by reading it in the newspaper, some account of it?  Have you talked to any witness who contended they had some peculiar knowledge regarding the facts of the case?  Have you talked to any of the witnesses in this case?

Three jurors responded to this question.  Michael Thompson told the court that he had heard some evidence in this case and had a fixed opinion about it.  He was excused from the jury. Martha Ann Allen reported reading something about the case in the *Newton Record* the week before, but said that she could put that aside and judge the case solely on the evidence.  Allen did not serve on the jury.  James Alvin Ward said he had heard about it through the news media, but said he could put it aside.  Ward did not serve on the jury.  During later voir dire by defense counsel, Mattie McMillan said that her curiosity was aroused when the jury summons indicated that it was a capital murder case, but she did not discuss it with anyone, nor did she read the newspaper.  McMillan was not selected for the jury.

The procedure used by the trial court to identify persons who might have been exposed to pretrial publicity and prejudiced by it was constitutionally adequate.  *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).  Even jurors who came to court with some pretrial knowledge about the case could have been properly seated if they indicated that they had not formed an opinion about it.  *Id*. at 428.  Here, the fact that none of the jurors who was chosen had knowledge about the case prior to being summoned for jury duty defeats Gray's claim that he was prejudiced by pretrial publicity.

Gray also raises as grounds for ineffective assistance of counsel trial counsel's failure to object to the trial court's excusing black jurors for cause, in light of the insufficient number of black jurors in the venire.  This claim was addressed in the state court's decision on post-conviction.  Citing state law, the court listed three elements that must be proved to show that a jury represented an unfair cross-section of the community: "(1) that the group is a distinctive group in the community; (2) that the group is not fairly and reasonably represented in the venires

from which juries are selected; and (3) that the under-representation of that group is due to its systematic exclusion from the jury selection process." *Gray*, 887 So. 2d at 165 (quoting *Lanier v. State*, 533 So. 2d 473, 477 (Miss. 1988)).  Because the record in Gray's case showed that black and white jurors were equally considered and excluded for valid reasons establishing cause, the court found that Gray had not met his burden to establish this claim.

Gray has not shown how this decision was contrary to or an unreasonable application of federal law.  In fact, he has not discussed it at all in his pleadings, which, as explained earlier, amounts to an abandonment of the claim.  Alternatively, the claim is without merit.  The requirement that a jury be pulled from a fair cross-section of the community is fundamental to the Sixth Amendment's guarantee of a fair trial.  *Taylor v. Louisiana*, 419 U.S. 522, 697-98 (1975).  Therefore, selecting a jury from only special segments of the community, or excluding large, distinctive groups, violates that guarantee.  *Id*. at 698.  However, where there is no state-created impediment to jury service by a particular group, the fact that they are under-represented in a particular venire does not establish a constitutional claim.  *Hearn v. Cockrell*, 73 Fed. Appx. 79 (5th Cir. 2003).  "Defendants are not entitled to a jury, jury wheel, pool of names, panel, or venire of any particular composition, and there is no requirement that those bodies 'mirror the community and reflect the various distinctive groups in the population.'" *Id.* (quoting *Taylor*, 419 U.S. at 538).  Because Gray cannot make out a substantive claim regarding the racial composition of the venire that was summoned in his case, he cannot establish that his attorneys were ineffective in failing to object to it.

Finally, Gray maintains that his attorneys provided ineffective assistance of counsel by failing to file a motion to quash the indictment on grounds that it did not contain the essential

elements of the crime charged.  The underlying claim was raised as two separate issues in state

court.  On direct appeal, Gray argued that the indictment was defective because the underlying

offenses were described in the disjunctive.  As noted earlier, the Mississippi Supreme Court held

that the issue was procedurally barred, noting that, although Gray moved to quash his indictment

on other grounds, he did not attack the language contained therein.  *Gray,* 728 So. 2d 36 at 70.

Gray argued in his post-conviction petition that the indictment improperly omitted the

aggravating circumstances.  The Mississippi Supreme Court held that the indictment was proper

under state law.  *Gray*, 887 So. 2d at 174.  In his pleadings in this Court, Gray has done no more

than list this claim as one of the grounds for his assertion that his attorneys were ineffective.

There is no discussion of the issue, nor is there any citation to authorities that support Gray's

argument.  As explained earlier, this claim has been effectively abandoned.  Moreover, this Court

addressed the underlying claim earlier in this Opinion and found it to be without merit.

In conclusion, the Court has carefully considered each of Gray's claims of ineffective

assistance of counsel.  Under the deferential standard established for habeas corpus review, this

Court cannot conclude that the state court's opinion was contrary to or unreasonably applied

federal law.  Nor has the Court determined that any of the state court's factual findings were

unreasonable based on the evidence.  For these reasons, Gray has not stated a claim for habeas

corpus relief on grounds that the representation provided by his attorneys in state court was

constitutionally infirm.

## J.  CUMULATIVE ERRORS

Gray argues that all of the errors alleged in his Petition for Writ of Habeas Corpus, when

considered together, mandate reversal.  The cumulative error claim was raised in the post-

conviction petition and denied.  The court held that Gray's assignment of errors were without

merit.  "Since Gray has not yet shown any actual error by the trial court, there can be no

cumulative effect and no adverse impact upon his constitutional right to a fair trial."  887 So. 2d

at 172-73.  *See Lynch*, 951 So. 2d at 555 (holding that errors that are accumulated need not, in

themselves, be reversible; however, where there is *no* error, harmless or otherwise, there can be

no cumulative effect of errors that requires reversal).

      The court's decision is neither contrary to, or an unreasonable application of, clearly

establish federal law as set forth by the United States Supreme Court.  There is no Supreme

Court case on this issue, although the Court has been called upon in other cases to set a standard

for cumulative error review.  The Fifth Circuit in *Derden v. McNeel*, 978 F.2d 1454 (5th Cir.

1992) (en banc), *cert. denied,* 508 U.S. 960 (1993), adopted a rigorous standard for cumulative

error analysis:

> [W]e now hold that federal habeas corpus relief may only be granted for cumulative
> errors in the conduct of a state trial where (1) the individual errors involved matters of
> constitutional dimension rather than mere violations of state law; (2) the errors were not
> procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial
> that the resulting conviction violates due process.'

978 F.2d at 1456 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also Turner v.*

*Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007).  Gray has failed to establish any of these factors.

## CONCLUSION

      Having reviewed each of Gray's claims for habeas corpus relief under the deferential

standard of review required by 28 U.S.C. §2254(d), it appears that none possesses sufficient

merit to warrant issuance of the writ.  The Court finds no part of the Mississippi Supreme

Court's opinions to be an unreasonable application of clearly established federal law, or an

unreasonable determination of the facts in light of the evidence presented, sufficient to justify

habeas corpus relief.  It is the opinion of the Court that Rodney Gray is not entitled to habeas

corpus relief under 28 U.S.C. § 2254.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Rodney Gray's Petition for

Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is hereby **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that this action is hereby **dismissed**

**with prejudice**.  A separate final judgment dismissing this action with prejudice shall be entered

in accordance with FED. R. CIV. P. 58.

**SO ORDERED AND ADJUDGED** this the 24th day of October, 2008.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE

89